No. 49,743

Boyd Beebe, *Appellee,* v. Marilyn Jean Chavez, *Appellant.*

(602 P.2d 1279)

Opinion filed December 1, 1979.

*Allan Hazlett,* of Kansas Civil Liberties Union, argued the cause, and *John A. Dicke,* of American Civil Liberties Union, was with him on the brief for the appellant.

*Richard D. Heeney,* of Galloway, Wiegers, Sprouse & Heeney, of Marysville, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Miller, J.: This is an action in habeas corpus. The district court of Marshall County entered judgment awarding custody of a twelve-year-old boy, Robert, to his father, Boyd Beebe, the appellee. The child's mother, Marilyn Jean Beebe Chavez, appeals, asserting numerous errors which we will consider later in this opinion.

Robert Beebe, son of Boyd and Marilyn, was born on October 5, 1965. While they were living in Havasu City, Arizona, Boyd and Marilyn separated in June of 1970, Boyd returning to Nebraska and Marilyn remaining in Arizona. Boyd paid little if anything towards the support of his wife and son during the ensuing 18 months. In November, 1971, the marriage was dissolved by decree of the Superior Court of Cochise County, Arizona. Marilyn was awarded custody of Robert, and Boyd was required to pay support, attorneys' fees, and costs. Boyd was awarded visitation privileges. A provision in the decree prohibited Marilyn from taking Robert outside of the United States without a prior court order, excepting for visits of short duration to the Republic of Mexico. Following the granting of the divorce, Boyd made regular child support payments until the fall of 1974. He has paid nothing since that time, and he has not paid the attorneys' fees as ordered in the Arizona divorce decree. No

motion to enforce visitation, to modify child support payments, to change visitation, to change custody, or to cite either parent for contempt has ever been made in the original action.

Marilyn remarried on September 12, 1973. Her second husband, Mr. Chavez, is a citizen and resident of the Republic of Mexico. Since 1973 Marilyn and Robert have been living with Mr. Chavez in Mexico. Marilyn, meanwhile, has made regular trips back to the United States, in order to maintain her citizenship. She has friends who live in the same home occupied by Marilyn and Boyd during their marriage, which Marilyn still owns; all mail addressed to Marilyn at that address, including the support payments which were sent there by the clerk of the Arizona court, is forwarded to Marilyn, wherever she may be. Marilyn and her husband have lived at four different places in Mexico, and Robert has regularly attended public school there.

In October, 1974, Marilyn and Robert came to Marysville, Kansas, because of the illness of Marilyn's parents. Marilyn hoped to reside there and obtain a sponsor for Mr. Chavez, so that he too could come to the United States. Marilyn rented an apartment and enrolled Robert in school. Robert obtained a pair of glasses upon recommendation of school officials. Boyd visited Marilyn in Marysville; he had a support check in his pocket, but did not deliver it. According to Boyd, he was hoping to force Marilyn to return to the Arizona court by cutting off support payments; he had already done so. About the time of this meeting, Boyd contacted a Nebraska attorney who advised him of the possibility of kidnapping Robert in order to obtain custody. Marilyn learned of the potential kidnapping threat and she immediately fled, taking Robert with her, and returned to Mexico. In her hurry, she left behind various items of clothing and Robert's glasses. After she arrived in Mexico, Marilyn wrote to Boyd, telling him in effect that she did not want any further support payments, and to leave her and Robert alone.

Marilyn next returned to Marysville about March 5, 1977, at the request of her father; her mother was dying of cancer. Marilyn took Robert out of school and brought him with her; arrangements were made for Robert to enter school in Marysville on or about March 15. A cousin of Marilyn's by marriage, Jane Oehm, called Boyd and arranged for him to see the district magistrate judge at Marysville on Saturday night, March 12, 1977.

The juvenile file, containing the records of the proceedings before the district magistrate judge, was handed to the district judge at the time of the hearing of the habeas action which is the subject of this appeal. There was no objection made to the offer, and the reasonable inference is that counsel was requesting the court to take judicial notice of the file in its own court. See K.S.A. 1978 Supp. 38-801 *et seq.*, and chapter 59 of the Kansas Statutes Annotated, as amended. Obviously, under these circumstances, the trial court took judicial notice of the juvenile records, which it was authorized to do. That juvenile record is thus made a part of the record in this case, and a statement of those proceedings is necessary to a complete understanding of the matter before us.

Although no petition was on file and no proceeding was pending, the district magistrate judge entered an order on March 12, apparently based upon the testimony of Boyd, granting the immediate temporary custody of Robert to the Kansas Department of Social and Rehabilitation Services until the further order of the court. No prior notice was given to Marilyn, nor was she permitted to appear and be heard. The order states that the court hears the testimony of Boyd and considers other evidence indicating that Robert is in need of medical attention; that Robert has not attended school; that Marilyn "has purposely lived in Mexico to avoid the jurisdiction of the Superior Court of Arizona in reconsidering the award of child custody to her"; and that Marilyn has forced Robert to vomit to rid him of "demons." The order giving SRS the immediate temporary custody of Robert was executed around 10 o'clock that night; agents of SRS, the sheriff's office, or both, armed with copies of the court order, took Robert from his mother and placed him in a foster home. Robert was examined by Donald Argo, M.D., on the same date, presumably after he was taken into custody. The physician's complete report reads:

"Re: Robert Beebe.
"I did on March 12, 1977, examine this child.
"I found no physical evidence of neglect.
   "My impression was that he was in good physical health. I did, however, note a slight speech impediment and that he is perhaps somewhat mentally slow, this could be a lack of formal education."

Thus on the night Robert was taken into custody, SRS and the court found that the major reason advanced for emergency action was false: Robert was in good health; he was not neglected; he needed no medical care.

Two days later, on March 14, a representative of SRS filed a petition in the "Juvenile" court, alleging that Robert is a dependent and neglected child because:

"The natural parent neglected or refused when able to do so, to provide proper or necessary support and education required by law, or other care necessary for his well being.

"Said child is without proper care, custody or support. All in violation of the Kansas Juvenile Code."

The wording is taken almost verbatim from the statutory definition of a dependent and neglected child contained in K.S.A. 38-802(g). There is no showing that the petitioner had any personal knowledge of the "facts" therein recited, or that any investigation was made by the SRS prior to that time. The details of Marilyn's alleged neglect of her child were not disclosed.

Marilyn was notified on March 14 to appear at 9 o'clock a.m. on March 16 to answer the petition. The transcript does not explain why, but the hearing was not held on that date; it was delayed until March 30. Marilyn then appeared without counsel; the court heard testimony, found Robert to be "a dependent and neglected child," and awarded custody to SRS; the court requested a complete report from that agency. There is no indication in the file that any such report was ever furnished. The testimony at the March 30 hearing was not reported, and no summary of it—and no findings of fact—are contained in the court's order.

Later, Marilyn retained counsel; many motions were filed in her behalf. One sought visitation privileges, alleging that Marilyn was only permitted to see her son twice during the first three months he was in SRS's custody. The motions were never ruled upon; instead, on June 16, the court on its own motion continued the case "until further notice."

Boyd filed this habeas action on July 7, 1977. On the following day, Marilyn was notified that the juvenile matter would be heard on July 14; on that day the juvenile proceeding was dismissed by agreement of the parties. Robert was returned to the custody of his mother, but she was ordered not to leave the jurisdiction of the court pending disposition of the petition for habeas corpus. Five days later, on July 19, 1977, this case was tried before the district judge on the petition for the writ. The court heard testimony from several witnesses, including Boyd, Marilyn, the foster mother, and members of Marilyn's family, and several exhibits were

received into evidence. We will detail the evidence later. At the conclusion of trial, the court placed Robert in the custody of SRS, and Robert was returned to the foster home. Boyd and Marilyn were ordered to submit to psychological evaluation and home studies, and the court also ordered that Robert be evaluated to determine his psychological, emotional and academic condition, with consideration for his bilingual background.

Several matters that surfaced during the hearing deserve attention: Robert's vision; Robert's hearing; his immunization; and Marilyn's religion. As to vision, when Robert was enrolled in school it was found that he was nearsighted. Glasses were obtained for him, and he was advised to wear them while reading or watching television. When Marilyn left in 1974 and failed to take Robert's glasses along, she knew that Boyd had been advised to kidnap Robert; Marilyn left hurriedly to avoid losing her son. As to Robert's hearing, the trial court, on September 22, 1977, issued an ex parte order, apparently on the advice of a Topeka hearing specialist who had not seen Robert, ordering that Robert submit to treatment for an alleged hearing problem. Marilyn objected, and the matter was dropped when the physician refused to see Robert. The foster home operator, in whose care Robert was placed for many months by SRS, said nothing about any hearing problem; the school Robert attended is not reported to have suggested any such problem; and the guardian ad litem found no hearing problem. There was no evidence before the trial court that Robert has any hearing deficiency. As to immunization, when Robert was enrolled in school in Marysville, state-required immunizations were necessary. Boyd authorized the immunizations by written consent. Testimony adduced at the hearing indicated that Robert initially questioned whether the immunizations were compatible with his religious beliefs. Apparently no effort was made to secure authorization for immunizations from Marilyn, and the immunizations were secured. We will discuss the matter of religion later in this opinion.

Counsel argued various motions on November 28, 1977, and the trial court expressed its views in a formal memorandum decision issued December 13, 1977. The material parts of that memorandum read as follows:

"The record concerning defendant is not clear, but she apparently made frequent visits to Mexico to engage in her work as a non-sectarian religious

sermonizer. She eventually married a Mexican national who does not have the necessary papers to immigrate to the United States so Mrs. Chavez journeys back to the United States at certain intervals in order to renew her permits to live in Mexico. The Chavezes have a 14-month old daughter, as a result of the marriage. Mrs. Chavez testified that her work in Mexico requires frequent moves, that they live in adobe houses without many of the conveniences found in America, that she believes God will take care of her and Robert and that she does not believe in medical treatment, that Robert can attend school in Mexico as opportunity may provide as many Mexican nationals do not attend school as do children living in the United States, that if she is granted custody of Robert she will return to Mexico.

"The Court finds that the defendant and her son, Robert, were in Marshall County, Kansas, during the spring of 1977, that Robert did not attend school and a petition was filed alleging that he was dependent and neglected. This petition was eventually withdrawn and the instant action was filed.

"The defendant in this action complains that plaintiff should not be afforded any equitable consideration because he comes into Court with 'unclean hands.' The plaintiff did not exercise visitation privileges because defendant spent most of her time in Mexico which apparently was in violation of the Arizona decree. It is further true that he has made but little in the way of child support payments, but here again defendant cannot complain because she asked plaintiff in 1974 not to make any further payments. This Court is of the opinion that there has not been such misconduct or malfeasance on the part of the plaintiff to invoke the 'clean hands' doctrine.

"The defendant also contends that K.S.A. 60-1501 through 60-1505 and 60-1610 are unconstitutional and that they violate petitioner's right to family integrity and privacy in contravention of the First, Ninth, and Fourteenth Amendments to the Constitution of the United States. Defendant also contends that her Sixth Amendment rights were also violated. This Court is of the opinion that in child custody proceedings the rights of the parents are not at issue and that the child's best interest is the cardinal principle in determining the right as between parents to custody, Burns v. Burns, 177 Kan. 116, Lyerla v. Lyerla, 195 Kan. 259. In Re. Bort, 25 Kan. 215 [sic 308].

"Although it is the policy of this state to give to a decree of divorce rendered in a sister state the same force and effect, so far as it can be done, as though the decree were entered by a court of this state, full faith and credit has only limited application to a child custody decree, it being inherent in such a decree that it is not final or conclusive but is always subject to the rights of the parties to show a subsequent change of circumstances and conditions, Anderson v. Anderson, 214 Kan. 387.

"The Court now finds that circumstances have changed since the Arizona decree in 1971, defendant and Robert no longer are full time residents of the United States, defendant has now interpreted her religion as barring medical treatment for her son and she shows no great concern for Robert's education who, despite her wishes to live in Mexico, is a United States citizen and who is entitled to all of the educational advantages afforded to United States citizens.

"The order of the Arizona court is res judicata only as to matters as they existed when the order was made and does not bar inquiry into the issue of custody where circumstances have changed.

"Some persons prefer to live in and pursue their interests in foreign lands. However, this Court, as well as any average person in the United States, can hardly overlook the many articles in the newspapers and magazines of national distribution, that many persons, particularly Mexican nationals, enter the United States by the hundreds of thousands each year. Would it be in the best interest of Robert that he be returned to the custody of his mother to return to live in Mexico as she testified she would do as soon as these proceedings were terminated, so that she may continue to pursue an unorthodox religion. Should a person of tender years be precluded from the advantages available to citizens of the United States simply because his mother prefers to live in a foreign country. This court is of the opinion that the interests of Robert be best served if he remained in the United States where he could obtain proper medical treatment and proper schooling and such other advantages as available to a citizen of this country.

"Accordingly the Court awards custody of Robert J. Beebe to his father, Boyd Beebe, the defendant to have all reasonable visitation privileges so long as they do not involve removal of the child to Mexico or to any other place outside the continental United States. Cost of this action assessed to plaintiff."

The appellant challenges K.S.A. 60-1501, 60-1505(c) and (d), and 60-1610(a)(i) as being unconstitutional. The argument asserted depends primarily upon recognition of a constitutional right to family integrity. The appellant relies on two United States District Court cases, *Alsager v. District Court of Polk Cty., Iowa,* 406 F. Supp. 10 (S. D. Iowa 1975), and *Roe v. Conn,* 417 F. Supp. 769 (M.D. Ala. 1976).

It must be noted the *Alsager* and *Roe* cases involved temporary or permanent termination of parental rights as part of a dependency and neglect or child abuse proceeding. The court is cited to no cases where the family integrity doctrine has been applied to a custody dispute between parents who are both fit custodians. While this litigation commenced with the initiation of an action under K.S.A. 1978 Supp. 38-320 *et seq.,* entitled "Dependent or Neglected Children," which provided the basis for the original summary seizure of the child, that action was dismissed and no appeal has been taken from those proceedings.

The Kansas Appellate Courts have recognized the importance of parental rights in severance proceedings. See *In re Atwood,* 2 Kan. App. 2d 680, 681-2, 587 P.2d 1 (1978).

Contrary to the appellant's contention, the right to family integrity is not infringed in a purely domestic dispute over custody of a child. The right to family integrity has only been recognized when a non-parent third party, or the State, was seeking to remove the child temporarily or permanently from the parents or lawful guardian.

Older Kansas cases indicate that custody disputes are matters of private rights contested between private parties. However, that statement of the law has been relied upon only in cases questioning the res judicata effect of prior proceedings. See *Walker v. McNutt,* 165 Kan. 533, 539, 196 P.2d 163 (1948); *Wear v. Wear,* 130 Kan. 205, 213, 285 Pac. 606 (1930); *In re Hamilton,* 66 Kan. 754, 756, 71 Pac. 817 (1903). See also 39 C.J.S., Habeas Corpus § 124 b., p. 915.

To recognize the family integrity doctrine urged by the appellant in the context of a custody dispute between parents would lead inevitably to a wholesale rejection of the "best interest of the child" standard. That standard is inherently vague; but we have not found, nor do our cases suggest, a practical alternative to it.

We do not find the habeas corpus statutes unconstitutional. These statutes do not *require* the court to separate a child temporarily from both parents pending hearing and final decision in the case; separation is a discretionary matter. The test upon appeal in a habeas corpus action involving child custody, where the best interests of the child are at stake, turns upon the reasonableness of the exercise of the discretionary power of the trial court. In all such cases the exercise of a trial court's power of discretion is subject to review on the issue of reasonableness, and the matter of jurisdiction is subject to appellate review. Before we turn to those issues, however, we should note that K.S.A. 60-1610(*a*)(*i*) is not subject to constitutional challenge in this action. This is a habeas corpus proceeding, and that statute is not here involved. We deal here with K.S.A. 60-1501 and 60-1505(*c*) and (*d*), and for the reasons stated we hold that those statutes are not unconstitutional.

We turn first to the question of jurisdiction. The habeas action below was in effect but a continuation of the juvenile proceeding started many months before—with the father of the child "mending his hold" and changing his tactics to rely upon the "best interest of the child" test when it appeared that his claim of neglect must fail. Clearly there is nothing in this entire record to *suggest*—let alone establish—that Marilyn neglected Robert. To the contrary, the record is overflowing with her love, care, and concern for him. He was in school, he was in good health, he needed no physical, medical, or spiritual care. He was never

separated from his mother until the awesome power of the State of Kansas wrested him from her late that March night.

One basic and fundamental principal of American law is that a litigant must have notice and an opportunity to be heard before any decision is made in a case involving that person. Notice and an opportunity to be heard and to defend are essential elements of due process of law. *Brown v. Fitzpatrick*, 224 Kan. 636, 640, 585 P.2d 987 (1978). The requirements of notice and hearing were incorporated in and made a requisite of the detention hearing procedure by the 1976 amendment to K.S.A. 38-815b. The magistrate completely ignored that statute. Marilyn was denied her right to due process; to notice and an opportunity to be heard; to a fair hearing. The magistrate decided that she was not a fit parent, but a neglectful and harmful one, and that her child ought to be seized by the State and taken from her forthwith, all without notice and hearing. The decision was made at night, away from the public eye, on the basis of statements of her former husband. Once that decision was made, the die was cast. Marilyn had lost all, without her day in court.

One point deserves emphasis: *there was no emergency.* Robert needed no medical attention; the physician's report settles that issue. If he needed glasses or a hearing aid, certainly those problems could be dealt with in the usual course; neither was of an emergency nature. There was no abandonment; no abuse; no mistreatment; nothing to require or justify immediate action.

Robert and his mother were temporary visitors in our state. The courts of Arizona had continuing jurisdiction over both custody and support. Ariz. Rev. Stat. § 25-332; *Anderson v. Anderson*, 14 Ariz. App. 190, 481 P.2d 881 (1971); *Beard v. Greer*, 116 Ariz. 536, 570 P.2d 223 (1977). Absent any showing of an emergency situation, our courts should have refused to exercise jurisdiction in the interest of comity. Our legislature has since made this clear: the mere presence of a child within this state is not alone sufficient to confer jurisdiction to make a child custody determination, unless the child has been abandoned, or an emergency requires that the child be protected, or no other state has jurisdiction, or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum. K.S.A. 1978 Supp. 38-1303(*a*)(3) and (4). Further, courts of Kansas may not exercise jurisdiction in child custody cases "if at the time of

filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with" the Kansas Uniform Child Custody Jurisdiction Act. K.S.A. 1978 Supp. 38-1306. Arizona has also adopted that act. Ariz. Rev. Stat. 1978-1979 Supp. § 8-401 *et seq.*

Professor Bodenheimer, commenting upon the emergency jurisdiction provisions of the Uniform Child Custody Jurisdiction Act, says:

"One of the basic tenets of the Act is that the physical presence of a child in a state does not confer on that state jurisdiction to modify custody if another state has jurisdiction. Only when a child is stranded or abandoned in the state, or there is an emergency arising from mistreatment, abuse or neglect, may the state where the child is present take protective measures. The Commissioners intended this emergency exception to have a very limited scope: 'this extraordinary jurisdiction is reserved for extraordinary circumstances . . . . When there is child neglect without emergency or abandonment, jurisdiction cannot be based on this paragraph.'

"This exceptional jurisdiction exists in very few cases. Naturally, there will be attempts to circumvent the Act by 'shouting fire' in every conceivable situation. Emergency jurisdiction must be denied, however, when it is invoked as a pretext in order to reopen a custody controversy. Unless judges and attorneys are constantly alert to the dangers inherent in misuses of emergency jurisdiction to circumvent the Act, the exception could tear so large a hole in the Act that custody decrees made in one state would again be relitigated in other states; and the interstate chaos that the Act was intended to remedy would be revived and perhaps intensified.

"The question, then, is: What are legitimate uses of emergency jurisdiction?

"Clearly, an emergency exists when a child is in immediate danger from a source within the state's borders. For example, suppose a case in which a child's parents are killed in an accident away from home and the child survives. A court in the state of the accident has jurisdiction to place the child into a temporary home. Or suppose that the custodial parent travels to the state where the child is visiting and threatens the former spouse and the child with violence. Again, the state of the visit has power to intervene. Additionally, an emergency exists if, prior to any custody adjudication, a parent brings the child to a state and the other parent, who still has equal custody rights, follows to claim the child. In such a situation the child has no parent capable of exercising effective parental control; the parental feud is fraught with danger for the child so that it is urgent to settle the dispute by way of a temporary custody order pending adjudication in the proper state." 65 Cal. L. Rev. 978, 992-993 (1977).

Robert and his mother were not Kansas residents, at least with any degree of permanency; they had been here only a few days. Boyd was not a Kansas resident. Absent any real emergency, the Kansas courts had no responsibility or immediate interest in the

matter of custody, and in the interest of comity should not have assumed jurisdiction beyond the initial issue of the claimed unlawful restraint.

The case of *Jolly v. Avery,* 220 Kan. 692, 556 P.2d 449 (1976), was our most recent pronouncement upon the subject of habeas corpus dealing with child custody at the time the case now before us was heard. In *Jolly v. Avery,* the parties had been divorced in Michigan, and the courts of that state had continuing jurisdiction over the matter of custody and support of the child. The child was in Kansas temporarily for visitation with the father; he refused to return the child to the mother; she sought a writ of habeas corpus in an effort to regain custody. The trial court recognized its jurisdiction to have an evidentiary hearing under the then applicable Kansas law, but declined to do so in the exercise of its discretion. We affirmed.

Similarly, in *Anderson v. Anderson,* 214 Kan. 387, 520 P.2d 1239 (1974), the trial court refused to hear evidence of changed circumstances and determined only the issue of unlawful restraint. We held that, in the exercise of its discretion, the trial court was fully justified in that action, and we affirmed.

The petitioner here, Boyd, had made no effort to secure any change of custody in the Arizona court. He had not made the payments for support and attorneys' fees required by that court's order, and for that reason was reluctant to apply to that court for relief, though the Arizona court had continuing jurisdiction. Under those circumstances we hold that the trial court abused its discretion when it proceeded to hold an evidentiary hearing and decree a change of custody.

However, assuming that jurisdiction was properly exercised, are the findings of the trial court supported by substantial, competent evidence? And does the order of the trial court rest upon sound logic and lawful grounds?

The court characterizes Marilyn as "a non-sectarian religious sermonizer" whose work requires frequent moves. The record does not support these findings; to the contrary, Marilyn testified that her faith did not require her to leave her residence and to attend meetings, conventions, or religious ceremonies. It does not take her away from home. Her home has been open to children who need food, clothing, shelter, and love; she couldn't begin to count those who have been in her home during the past three

years. During the first four years of her marriage to Chavez, Marilyn lived in four different cities; nowhere in the record is there evidence that these moves were necessitated or occasioned by her religion.

Custody was changed for two reasons:

> (1) because Marilyn would raise Robert in Mexico where he could not obtain "proper medical treatment" and "proper schooling" and "such other advantages as [are] available to a citizen of this country"; and

> (2) because Marilyn pursues "an unorthodox religion."

The fact that a child may secure what one person may consider "proper schooling" in one area and not in another may be a factor to be considered, but it should not be controlling in a matter as complex as child custody. Should custody always be given to a parent who lives in a metropolitan school district, where perhaps a more sophisticated educational process is available than in a less populous area where the other parent may reside? Of course not.

There was no evidence that "proper medical treatment" was unavailable in Mexico, or that Robert was ever neglected for that reason. He lived and attended school in Mexico for three years, and he emerged "in good physical health."

Marilyn was not questioned as to her religious beliefs concerning medical treatment, and the evidence of her beliefs is sparse. Assuming, however, that her religion does discourage or prohibit the use of drugs or medications, or treatment by physicians, is that a valid reason to change custody? Christian Science, a denomination with wide membership, has similar teachings; it discourages as unnecessary the use of drugs or treatment by physicians; yet though such beliefs may be "unorthodox" to the trial judge, they are constitutionally protected and form no basis for denying or changing custody. In *Jackson v. Jackson,* 181 Kan. 1, Syl. ¶¶ 5, 6, 309 P.2d 705 (1957), we said:

"[T]he question of religion cannot be regarded by the court in determining the care, custody and control of minor children. The courts have no authority over that part of a child's training which consists in religious discipline, and in a dispute relating to custody, religious views afford no ground for depriving a parent of custody who is otherwise qualified."

"Religious freedom, as guaranteed by our Constitution, should be faithfully upheld, and religious teachings to the children by a parent or parents, regardless of how obnoxious the same might be to the Court, the other parent or the general

public should not and must not be considered as basis of making child custody orders."

The record overflows with evidence of Marilyn's love for her son, of his love for her, and of their close relationship. The guardian ad litem found "a strong bond of affection." Boyd, on the other hand, has had no hand in raising Robert; he has cut off Robert's support twice for long periods of time; and there is no indication of Boyd's love, affection, care, or parental concern, except his demand for custody. Love, affection, care, and concern, deserve as much if not more attention and consideration than does the matter of financial worth or affluence. Marilyn did not neglect Robert; she gave him constant love and care. Her custody should not have been terminated.

Other points raised need not be discussed in view of our disposition of this case.

The judgment is reversed and the case is remanded with directions to dismiss the petition.

SCHROEDER, C.J., dissenting: The court erroneously gives the impression the trial court was without jurisdiction to evaluate Robert's best interests and order a change of custody. The court relies heavily upon the Uniform Child Custody Jurisdiction Act, K.S.A. 1978 Supp. 38-1301 *et seq.*, claiming that no emergency existed to provide the trial court with jurisdiction. The court then skips a cog in its legal reasoning and declares that the absence of an emergency within the meaning of the UCCJA deprived the trial court of jurisdiction under the habeas corpus statute. In its haste to eliminate the trial court's jurisdiction, the court has ignored the fact that the UCCJA was not adopted in Kansas until *after* this habeas corpus proceeding was begun. This habeas corpus action was filed on July 7, 1977. The UCCJA, K.S.A. 1978 Supp. 38-1301 *et seq.*, was adopted in 1978 and took effect on January 1, 1979.

The Kansas Supreme Court has long recognized that a habeas corpus proceeding is a proper vehicle for the determination of questions pertaining to child custody. For the purpose of determining the right to the custody of a child, the inquiry in habeas corpus proceedings extends far beyond the issues that ordinarily are involved in such proceedings. This was fully discussed in *Miracle v. Miracle,* 208 Kan. 168, Syl. ¶¶ 1-4, 490 P.2d 638 (1971), wherein we stated:

"Where the rights of contending parents to the custody of their children is presented in a habeas corpus proceeding, the trial court has authority, where all parties are before the court and the children are physically present in the State of Kansas, to hear evidence of a change of circumstances when faced with an allegedly valid order from a sister state awarding custody to the petitioner, regardless of whether the court finds that sister state's order to be constitutionally valid or invalid in the same proceeding.

"A habeas corpus proceeding is a proper vehicle for the determination of questions pertaining to child custody.

"The paramount concern of courts in every child custody proceeding is the welfare of the child.

"In the interest of a minor child's welfare, a court of this state, when the child is physically present therein, has jurisdiction over his care, custody and control, although the court of a sister state has 'concurrent jurisdiction.' "

Under Kansas habeas corpus statutes as construed by our case law, a court of this state, when a child is physically present therein, has jurisdiction over the child's care, custody and control. Here the trial court had a *child physically present in Marshall County where problems concerning the child's hearing, sight, and education were the subject of inquiry.* The trial court properly exercised its power of discretion and accepted jurisdiction in this action.

I am also disturbed by the court's violation of an elementary rule of appellate review, that this court will not reweigh the evidence on appeal. After invading the trial court's responsibility—to weigh the disputed testimony and observe the demeanor of witnesses first hand—the court erroneously finds that the trial court abused its power of discretion when it ordered a custody change.

Whether a child custody order will be changed or modified rests in the sound judicial discretion of the district court and its action will not be disturbed on appellate review unless the record makes it clearly appear the exercise of its power of discretion has been abused. *Perrenoud v. Perrenoud,* 206 Kan. 559, Syl. ¶ 6, 480 P.2d 749 (1971); see *In re Thompson,* 178 Kan. 1, 4, 282 P.2d 440 (1955); *Moloney v. Moloney,* 167 Kan. 444, 448, 206 P.2d 1076 (1949).

Several important *trial court findings* which were supported by the record were either omitted or distorted in the majority opinion. The majority states that Boyd was not concerned with his son's welfare and cites the failure to pay child support as proof.

The record shows that after the divorce Boyd diligently paid his child support obligation for several years. He discontinued the payments in compliance with appellant's wish, and also in hopes that she would later return to the Arizona courts to enforce the obligation. He wanted to litigate the custody matter in the court of original jurisdiction. It is clear Boyd's motive was to benefit the child. The discontinuance of payments followed on the heels of appellant's short trip to Kansas, when she enrolled the child in school, obtained needed glasses for him, and then surreptitiously returned to Mexico. The evidence indicates Boyd was kept informed of Robert's care and condition through Marilyn's family. Indeed, it was members of Marilyn's family who provided Boyd and the trial court with the initial evidence of Robert's neglected health and education.

The court glosses over the fact that *Marilyn was in violation of the Arizona custody decree when she took up residence in Mexico.* The Arizona decree prohibited Marilyn from taking Robert outside the United States without a prior court order, except for visits of short duration to the Republic of Mexico. Yet Marilyn married a Mexican National and resided in Mexico, returning to the United States for short periods on an irregular basis. She was required to return to the United States for a mere 24-hour period every 180 days in order to retain her United States citizenship. Marilyn and Robert have lived with Mr. Chavez in four different Mexican towns, the latest residence being approximately 250-300 miles from the United States border.

Contrary to the conclusion of the majority, there was ample support for the trial court's findings.

There is support for the trial court's finding that the appellant relied on God for medical treatment. The court-ordered psychological evaluation states the appellant "rejects the use of medication and physicians"; that Robert's need for speech therapy needed to be explored, and he suffered from a possible hearing impairment. *Robert was twice provided with needed glasses, but only when he was in Kansas.* Appellant left one pair of Robert's glasses behind in 1974, when she heard "through the holy spirit" of a possible kidnapping. Robert initially objected to school required immunizations on religious grounds. During the pendency of this action, *the appellant filed a motion to quash* an ordered medical examination, which effectively prevented rec-

ommended medical treatment for Robert's hearing impairment. While it is true there is testimony the appellant's religion does not bar all medical treatment, there is clearly support for the trial court's finding.

There is evidentiary support for the trial court's finding that Robert's education suffered from his family's moves and the lower quality of the Mexican school system. The court ordered evaluation of Robert indicated he has normal intellectual abilities, but his formal academic level falls distinctly below Kansas' norms. Robert did not begin school until he was eight years old, shortly before his ninth birthday. Mexican schooling does not begin until a child is eight years old. Robert was in the first grade for two years because he was not familiar with the Spanish language. When Robert was placed in school at Marysville at the beginning of this dispute he was found capable of doing fourth grade work. The appellant testified the use of identical textbooks at specific grade levels in all Mexican schools minimized any harmful effects of moving.

Any decision of this nature is inherently difficult, and when the evidence is in dispute the trial court has the advantage of observing the demeanor and weighing the credibility of the testimony of all witnesses. With due consideration for all of the evidence, including home studies and psychological evaluations, the trial court had a valid evidentiary basis for its findings.

The court also cites *Jackson v. Jackson,* 181 Kan. 1, 309 P.2d 705 (1957), and states that there was no authority to change custody on the basis of Marilyn's admittedly unorthodox religious beliefs.

The question in this case goes beyond religious freedom. Here the trial court was concerned that appellant's religious beliefs had led to neglect of Robert's health. He had vision, hearing and speech impairments which had gone unattended *until third parties forced action,* including members of Marilyn's family. In addition, Robert's education was suffering as a result of Marilyn's family's moves "here and there" in Mexico; moves which were in part prompted by religious practices.

If the religious beliefs of a parent threaten a child's health or well-being, or would lead to neglect of the child, the adverse effects upon the child may be considered in making a change of custody. See 24 Am. Jur. 2d, Divorce and Separation § 787, p.

894; Annot., 66 A.L.R.2d 1410, 1419. The misguided followers of Reverend Jim Jones transplanted their entire families to Jonestown, Guyana, as a demonstration of their love, care and concern for his religious preaching. Yet this court would not hesitate to find parents with such unorthodox religious beliefs are a real threat to the health and well-being of their children.

Since the trial court clearly concerned itself with the appellant's religion as it affected Robert's health and education, it cannot be said the trial court abused the exercise of its power of discretion in awarding custody of Robert to his natural father.

The majority opinion is obsessed with indignation over the initial seizure of Robert pursuant to a dependent and neglected child action. Here the Kansas Department of Social and Rehabilitation Services was involved. It is ironic that the court relies so heavily on the details of that juvenile proceeding. *None of the actions taken by the juvenile court in the dependent and neglect proceeding are before this court for review. No appeal was taken in that action isasmuch as the appellant consented to a termination of that action by dismissal. One of her issues on appeal in this habeas corpus action was an objection to the trial court's consideration of the evidence contained in that juvenile court file.* Undoubtedly it was unacceptable to the appellant because it supplied the necessary facts to support the trial court's findings.

Finally, I must be critical of the court's decision to reverse and remand with directions to dismiss. Two years have passed since Robert's custody was changed to his father. This fourteen-year-old boy has been living in Lincoln, Nebraska, attending public schools there. The court-ordered home study conducted in 1977 described the clean and comfortably furnished home which Robert would share with Boyd and Arlyne Beebe. Boyd and Arlyne have been happily married for eight years, and both had good steady jobs at the time the trial court ordered the custody change. All the evidence indicated that Boyd and Arlyne would provide Robert with a healthy and well-balanced academic and home environment. Both Boyd and Arlyne are indisputably fit parents to rear and educate Robert on the record here presented. Nevertheless, the court has chosen to reweigh the two-year-old evidence *in the transcript* and return custody of Robert to his natural mother.

It is respectfully submitted the judgment of the lower court should be affirmed.

FROMME and McFARLAND, JJ., join in the foregoing dissenting opinion.