(612 P.2d 188)

No. 50,764

WILLIAM WEST JOHNSON, *Appellee,* v. BARRY MELBACK and KATH-
LEEN MELBACK, *Appellants.*

Opinion filed June 13, 1980.

*Hugh D. Mauch,* of Keenan, Mauch & Keenan, P.A., of Great Bend, for
appellants.

*Jerry G. Elliott,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, and
*Barry A. Bennington,* of Shields & Bennington, P.A., of St. John, for appellee.

Before SPENCER, P.J., ABBOTT and PARKS, JJ.

ABBOTT, J.: This is an appeal from a court order granting
custody of two minor children to their father, William West
Johnson (Johnson). Johnson's sister and her husband, Kathleen
and Barry Melback (Melbacks), who had custody by virtue of a
California guardianship proceeding, appeal.

The two minor children, both boys, were born in June 1972 and
July 1973 during the marriage of William and Martha Johnson.
Martha Johnson received a head injury sometime in 1975, lapsed
into a coma and did not regain consciousness before her death. At
that time, Johnson was employed by Cities Service (his present
employer) in Borger, Texas. Then, as now, he had shift duties and
rotated each week. Johnson's mother-in-law took care of the boys
until mid-October of 1975, when she no longer was able to do so.
Johnson then used the services of a day care center and miscella-
neous babysitters. The oldest boy received a third degree burn on
his leg while at a babysitter's. It appears the burn was a result of
child abuse on the part of the sitter. The incident was not reported
and Johnson, who continued to use the same babysitter, treated
the burn. A week or two later, at the hands of the same babysitter,
the same child received abuse that resulted in a mass of bruises
covering the entire area from his waist to his knees. The child also
had a facial bruise in the outline of a hand, and Johnson testified
that he himself "accidently" caused it when he slapped the child.
In spite of this abuse, Johnson continued to use the same baby-

sitter. The incidents of abuse took place in early March of 1976. In March 1976 the State of Texas took custody of the children for seven days, but apparently no charges were filed. Johnson made arrangements for the Melbacks to take care of the children and he delivered them to the Melbacks in California on April 7, 1976.

After the children were in California, Johnson visited them as often as his work and finances would allow. Johnson paid about $200 for support during the next fourteen months. Johnson had agreed to pay $100 a month for support, but the Melbacks were satisfied with the amount of support received.

In January 1977, Johnson met Haytchen, a divorcee who had three children, and she moved in with him two weeks later. In March 1977, Johnson and Haytchen went to California. The Melbacks were offended because the boys' mother was still alive, and they would not allow Johnson and Haytchen to stay in their home; instead, the Melbacks arranged for a motel room and a car for Johnson and Haytchen. In April of 1977, Johnson, Haytchen and her three children moved to Ulysses, Kansas. Johnson attempted to regain the boys, but the Melbacks concealed them. Johnson filed a habeas corpus proceeding in California on June 23, 1977, and the Melbacks countered by filing a guardianship proceeding. A hearing was held in July 1977 and temporary custody was given to the Melbacks. A guardianship hearing was scheduled for September but was continued to October 14, 1977. Also in July, Johnson filed a divorce action in Grant County, Kansas, against his wife, Martha, who was still comatose in a Texas rest home; the divorce was granted on October 4, 1977, and custody of the two boys was awarded to Johnson. The boys had never lived in Kansas prior to the divorce decree.

Johnson appeared in California in October 1977 and contested the guardianship proceeding. After a three-day trial the Melbacks' petition for guardianship was granted and custody of the two boys was awarded to the Melbacks. Johnson was awarded visitation privileges, including a one-month visitation during the summer of 1978. No appeal was taken from the guardianship order. We are not favored with a transcript of the California guardianship proceeding. The only document in the record concerning the California guardianship is the final order granting custody to the Melbacks. There are no findings of fact or conclusions of law. Johnson emphasizes that the California court did

not find him to be an unfit parent. As we understand California law, it is not necessary to find a parent unfit in order to award custody in a guardianship proceeding to a non-parent; however, as will be seen hereinafter, we are of the opinion the California guardianship proceeding is considerably more damaging to Johnson than he considers it to be.

Two days after custody was awarded to the Melbacks and some sixteen days after the Grant County divorce, Martha Johnson died in Texas. At some time during October 1977 Johnson, Haytchen and her three children moved to Stafford County, Kansas. The record reflects that during the California guardianship proceeding both Johnson and Haytchen testified they had purchased a home in Stafford, Kansas. Their testimony is not clear whether they had moved to Stafford before or after the California guardianship proceeding, but they indicated it was afterwards. In any event, if they had not yet moved, they knew they were going to and had prepared to do so. The move to Stafford was a transfer by the employer for whom Johnson was working when Martha was injured in Texas and who is still his employer. On December 2, 1977, Johnson married Haytchen in Stafford County. It was Johnson's sixth marriage. In addition to the two boys involved in this case, he has three children by prior wives. He does not now, nor has he ever, supported the other three children. He does not visit them and, in fact, was unable to recall the name of one of them.

The Johnsons (Bill and Haytchen) wrote three letters assuring the Melbacks they would abide by the California decree and would return the boys on July 19, 1978, at the end of the visitation period. The Melbacks allowed the two children to come to Kansas pursuant to the California order. On July 19, 1978, Johnson filed suit in Kansas requesting that custody be changed to him. He testified that when the children were brought to Kansas he intended to return them to California, but changed his mind when one of the boys mentioned they had to go back and see the judge when they returned to California. The record gives no indication why the boys were to see the California court. Notice was given to the Melbacks, who appeared and challenged the Kansas court's jurisdiction. The case was tried on September 11, 1978. Briefs were submitted and a journal entry of judgment was filed on January 8, 1979, granting custody to Johnson. The trial judge

found he had jurisdiction by virtue of K.S.A. 1979 Supp. 60-1610(*a*). He relied on *Perrenoud v. Perrenoud,* 206 Kan. 559, 480 P.2d 749 (1971), and decided not to give full faith and credit to the California guardianship proceeding. He found a change of circumstances (that Johnson had remarried and established residence in Stafford, Kansas, was steadily employed and living a good, normal, family life) and determined that it was in the children's best interest to be with their father.

In our opinion, this case is controlled by *Beebe v. Chavez,* 226 Kan. 591, 602 P.2d 1279 (1979), a case that was decided nearly a year after the trial court's decision in this case. Although the trial judge obviously did not have the benefit of the *Beebe* decision when he made his decision, we are of the opinion that *Beebe* and *Jolly v. Avery,* 220 Kan. 692, 556 P.2d 449 (1976), compel us to hold that the trial court abused its discretion when it exercised jurisdiction in this matter.

Before discussing *Beebe* and *Jolly,* we will briefly review the California guardianship. Guardianships in California are governed by Cal. Prob. Code § 1400 *et seq.* (West). In California, custody cases and guardianship cases have been held to be substantially similar and, where possible, are governed by the same rules. *Titcomb v. Superior Court,* 220 Cal. 34, 41, 29 P.2d 206 (1934). California follows the parental preference rule and by statute (Cal. Prob. Code § 1407 [West 1979 Supp.]) a parent is to be given preference over a relative in the guardianship of a minor. California courts recognize and are guided by the best interests of the child. A parent who abandons a child, or who, although able, fails to support a minor child, forfeits all right to guardianship of the child (Cal. Prob. Code § 1409). Our reading of California case law indicates that under the facts presented in Kansas, a California court would not have found abandonment. See *Guardianship of Clark,* 217 Cal. App. 2d 808, 32 Cal. Rptr. 111 (1963); *Guardianship of Rose,* 171 Cal. App. 2d 677, 340 P.2d 1045 (1959). Prior to January 1, 1970, a California court could award custody to a non-parent only if the parent was found to be unfit, and the non-parent had the burden of proving the parent's unfitness. *Guardianship of Clark,* 217 Cal. App. 2d at 810-11; *Guardianship of Newell,* 187 Cal. App. 2d 425, 10 Cal. Rptr. 29 (1960). There is a presumption that a parent is fit, and one who contends otherwise must overcome that presumption. *Stewart v. Stewart,* 41 Cal.

2d 447, 260 P.2d 44 (1953). Unfitness has to directly relate to the relationship of parent and child, and the fact that the non-parent who seeks guardianship is more able than the parent to provide financial, educational or social benefits does not render a parent unfit. *Guardianship of Smith,* 147 Cal. App. 2d 686, 306 P.2d 86 (1957). The court was required to make a specific finding of abandonment or unfitness, and it was reversible error not to do so. Whether the finding must be in the journal entry of judgment is unknown, but it is not material as no appeal was taken from the California decree.

Cal. Civ. Code § 4600 (West) became effective January 1, 1970. It provides that in *any* proceeding where custody of a minor child is at issue, the court shall make a finding that an award of custody to a parent would be detrimental to the child before the court can award custody to a non-parent. That section of the code applies to guardianship proceedings instituted by a non-parent, and it would appear all presumptions and burdens of proof concerning unfitness as a parent would apply to the "detrimental to a child" standard. *Guardianship of Pankey,* 38 Cal. App. 3d 919, 934, 113 Cal. Rptr. 858 (1974). The court in *Pankey* pointed out that a finding of parental unfitness is no longer required, but stated it would be difficult to distinguish between unfitness and facts that render a parent's custody detrimental to a child or children. With that background, we now turn to the *Beebe* and *Jolly* decisions.

This case, as did *Beebe v. Chavez,* 226 Kan. 591, occurred prior to the enactment of the Kansas Uniform Child Custody Jurisdiction Act (K.S.A. 1979 Supp. 38-1301 *et seq.*). Prior to the passage of that act, full faith and credit was not much of a barrier in preventing the Kansas courts from litigating changed circumstances. In *Perrenoud v. Perrenoud,* 206 Kan. at 576-77, the Supreme Court held:

"Frequently courts have been faced with the problem whether to give 'full faith and credit' or 'comity' to a sister state's decree and refuse to reexamine its merits, or to exercise their own discretion and protect the welfare of minor children within their jurisdiction. (*Kirby v. Kirby* [143 Kan. 430, 55 P.2d 356]; *Murphy v. Murphy,* 196 Kan. 118, 410 P.2d 252, 35 A.L.R.3d 512; *Leathers v. Leathers,* 162 C.A.2d 768, 328 P.2d 853.) An analysis of our decisions shows that the solution has been as varied as human needs. This has resulted in the general rule stated in our cases, and restated in *Lyerla v. Lyerla* [195 Kan. 259, 403 P.2d 989]. This court has recognized that a decree of a court of one state having jurisdiction relating to the custody of minor children, is, under the doctrine of 'comity' prevailing among sister states, entitled to recognition in this state. However, full

faith and credit has only limited application to child custody decrees; it is inherent in the nature of such a decree that it is not final and conclusive, but is subject to the right of the parties to show a change of circumstances and conditions." (*Price v. Price,* 187 Kan. 292, 356 P.2d 1013; *Moloney v. Moloney,* 163 Kan. 597, 185 P.2d 167; *White v. White,* 160 Kan. 32, 159 P.2d 461.)

For an interesting history of the progression of Kansas law in the area, see Comment, *Jurisdictional Guidelines in Matters of Child Custody: Kansas Adopts the Uniform Child Custody Jurisdiction Act,* 27 Kan. L. Rev. 469 (1979); Comment, *Conflict of Laws: Child Custody and Foreign Judgments,* 11 Washburn L.J. 305 (1972).

Johnson and the trial judge rely heavily on the rule announced in *Perrenoud* that the decision whether to exercise jurisdiction lies in the court's discretion and, further, that such discretionary action will not be easily overturned on appeal; but, even in *Perrenoud* the court found that circumstances may restrict the trial judge's unfettered exercise of discretion (see discussion on "clean hands" doctrine). *Perrenoud v. Perrenoud,* 206 Kan. at 577-79. Johnson stresses that the application of the "clean hands" doctrine rests within the sound discretion of the court and may not be disturbed absent a showing of clear abuse. Since *Perrenoud,* however, the Kansas Supreme Court has more fully explained the circumstances when such discretion to exercise jurisdiction is proper. In *Jolly v. Avery,* 220 Kan. at 698, the Court announced the rule that is applicable, stating:

"We hold that absent unusual circumstances, where a parent brings a child into this state for temporary visitation under an order of a court of another state, which has continuing jurisdiction to change or modify its decree, then in the interest of comity a Kansas court may, and in most instances should, give full faith and credit to the decree from our sister state and decline to hear on its merits an application to change custody made here under such circumstances. To hold otherwise would create chaos in child custody proceedings, discourage the granting of visitation privileges to nonresidents, aggravate relationships between separated spouses, and, most importantly, would adversely affect the children involved. Here, it is clear that respondent was holding the child in violation of the orders of the Michigan court."

Here, the record discloses that Johnson brought the children into Kansas for a one-month summer visitation as provided for under the order of the California court—which has continuing jurisdiction under California law (*In re Coughlin,* 101 Cal. App. 2d 727, 226 P.2d 46 [1951])—then violated that order by failing to return the children to California and challenged the California

order in Kansas. The facts in this case are closely analogous to *Jolly.* Johnson attempts to distinguish *Jolly* in two ways. He first argues that *Jolly* dealt with custody rights between parents and the case here involves a dispute between a parent and a third party. While recognizing the validity of the parental preference rule in Kansas, it must be noted that such an argument goes to the merits of the claim and should not be considered by the Kansas court in deciding whether or not to exercise jurisdiction. *Jolly v. Avery,* 220 Kan. 692, Syl. ¶ 1. If Johnson wishes to argue the application of "parental preference," he should raise the argument in the California court which, like Kansas, recognizes the doctrine. *In re Raya,* 255 Cal. App. 2d 260, 63 Cal. Rptr. 252 (1967); Cal. Prob. Code § 1407 (West 1979 Supp.). Johnson next argues it is discretionary with the trial court whether or not to exercise jurisdiction, that *Jolly* affirmed a trial court's decision refusing to exercise jurisdiction and we should now affirm a decision to exercise jurisdiction. In view of *Beebe,* the issue is not that simple.

*Beebe v. Chavez,* 226 Kan. 591, involved a parental custody dispute that had been litigated in Arizona and also had been decided prior to the enactment of the Uniform Child Custody Jurisdiction Act in Kansas. The Court explained its views on the exercise of jurisdiction as follows:

"Absent any showing of an emergency situation, our courts should have refused to exercise jurisdiction in the interest of comity. Our legislature has since made this clear: the mere presence of a child within this state is not alone sufficient to confer jurisdiction to make a child custody determination, unless the child has been abandoned, or an emergency requires that the child be protected, or no other state has jurisdiction, or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum. K.S.A. 1978 Supp. 38-1303(*a*)(3) and (4). Further, courts of Kansas may not exercise jurisdiction in child custody cases 'if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with' the Kansas Uniform Child Custody Jurisdiction Act. K.S.A. 1978 Supp. 38-1306. Arizona has also adopted that act. Ariz. Rev. Stat. 1978-1979 Supp. § 8-401 *et seq.*

"Professor Bodenheimer, commenting upon the emergency jurisdiction provisions of the Uniform Child Custody Jurisdiction Act, says:

" 'One of the basic tenets of the Act is that the physical presence of a child in a state does not confer on that state jurisdiction to modify custody if another state has jurisdiction. Only when a child is stranded or abandoned in the state, or there is an emergency arising from mistreatment, abuse or neglect, may the state where the child is present take protective measures. The Commissioners intended this

emergency exception to have a very limited scope: "this extraordinary jurisdiction is reserved for extraordinary circumstances . . . . When there is child neglect without emergency or abandonment, jurisdiction cannot be based on this paragraph."

" 'This exceptional jurisdiction exists in very few cases. Naturally, there will be attempts to circumvent the Act by "shouting fire" in every conceivable situation. Emergency jurisdiction must be denied, however, when it is invoked as a pretext in order to reopen a custody controversy. Unless judges and attorneys are constantly alert to the dangers inherent in misuses of emergency jurisdiction to circumvent the Act, the exception could tear so large a hole in the Act that custody decrees made in one state would again be relitigated in other states; and the interstate chaos that the Act was intended to remedy would be revived and perhaps intensified.

" 'The question, then, is: What are legitimate uses of emergency jurisdiction?

" 'Clearly, an emergency exists when a child is in immediate danger from a source within the state's borders. For example, suppose a case in which a child's parents are killed in an accident away from home and the child survives. A court in the state of the accident has jurisdiction to place the child into a temporary home. Or suppose that the custodial parent travels to the state where the child is visiting and threatens the former spouse and the child with violence. Again, the state of the visit has power to intervene. Additionally, an emergency exists if, prior to any custody adjudication, a parent brings the child to a state and the other parent, who still has equal custody rights, follows to claim the child. In such a situation the child has no parent capable of exercising effective parental control; the parental feud is fraught with danger for the child so that it is urgent to settle the dispute by way of a temporary custody order pending adjudication in the proper state.' 65 Cal. L. Rev. 978, 992-993 (1977).

. . . .

"The petitioner here, Boyd [Beebe], had made no effort to secure any change of custody in the Arizona court. He had not made the payments for support and attorneys' fees required by that court's order, and for that reason was reluctant to apply to that court for relief, though the Arizona court had continuing jurisdiction. Under those circumstances we hold that the trial court abused its discretion when it proceeded to hold an evidentiary hearing and decree a change of custody." 226 Kan. at 599-601.

Based on the record before us we are of the opinion the trial judge in the interest of comity abused his discretion when he elected to exercise jurisdiction in this case. No emergency existed, the children had not been abandoned, the California court was exercising jurisdiction, and the children were temporary visitors in Kansas.

Other issues raised need not be discussed in view of our disposition.

Reversed and remanded with directions to dismiss the petition.