(235 P.3d 547)
No. 102,214

MONICA HARRISON, now Mitchell, Next Friend and Natural Guardian of J.D.H., a Minor Child, *Appellee*, v. ADIEL TAUHEED, *Appellant*.

Opinion filed July 16, 2010.

*Linus L. Baker*, of Stilwell, for appellant.

*Rebecca Mann*, of Young, Bogle, McCausland, Wells & Blanchard, P.A., of Wichita, for appellee.

Before CAPLINGER, P.J., PIERRON and BUSER, JJ.

BUSER, J.: This is an appeal from the trial court's initial custody determination in a paternity case. The biological mother, Monica Harrison, now Mitchell, filed this action as the next friend and natural guardian of her son, J.D.H. The biological father, Adiel W. Tauheed, was the named respondent. After a bench trial, the district court ordered Monica and Adiel to share joint legal custody of J.D.H. The court also awarded residential custody to Monica with substantial parenting time to Adiel.

Adiel appeals, claiming the trial court generally applied an incorrect legal standard in evaluating which parent should have been awarded legal and residential custody of J.D.H. We conclude the trial court applied the correct legal standard—the best interests of the child—in evaluating this custody matter.

Of particular note, Adiel also asserts the trial court applied an incorrect legal standard, which resulted in the court's failure to consider evidence about Monica's religious beliefs and practices as a Jehovah's Witness. Adiel claims these religious beliefs and practices have adversely affected or could adversely affect J.D.H. in the future. As discussed more fully below, we review Kansas law regarding the legal standard a trial court should apply to evidence of a parent's religious beliefs and practices in a child custody case. We hold that a parent's religious beliefs and practices may not be considered by the trial court as a basis to deprive that parent of custody unless there is a showing of actual harm to the health or welfare of the child caused by those religious beliefs and practices. We conclude the trial court correctly applied this legal standard in making its custody determination. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Monica and Adiel first met in Wichita in 1999. Two years later, Monica became pregnant with J.D.H. Adiel acknowledges that J.D.H. is his biological son. About 6 months after J.D.H.'s birth in February 2002, Adiel left Wichita to attend graduate school in California. He later resided in Lenexa. During J.D.H.'s lifetime, Monica has resided in Wichita with her son, where she has provided for his care. Monica is a Jehovah's Witness and Adiel is a Muslim.

Monica has raised J.D.H. in the Jehovah's Witness faith. The couple did not marry each other.

Monica filed this paternity action on June 30, 2006, when J.D.H. was 4 years old. On February 17, 2009, when J.D.H. was almost 7 years old, the district court issued its custody ruling that is the subject matter of this appeal. Prior to the temporary order which gave Monica residential custody during this litigation, no orders regarding custody had been issued by any court. During the 4 years following the temporary order, Monica and Adiel informally and amicably cooperated regarding both support and custody of J.D.H.

During the litigation, David N. Johnson, an attorney, was appointed as a limited case manager to prepare recommendations to the district court regarding custody issues. Johnson prepared two comprehensive reports. The first report was dated April 19, 2007. A second report, dated May 16, 2008, updated Johnson's original recommendations. Both reports recommended that Monica and Adiel share joint legal custody of J.D.H., with Monica designated the primary residential parent.

On January 14, 2008, the district court approved and filed Monica and Adiel's proposed pretrial conference orders. Notably, Adiel did not contend that he should be awarded sole legal custody of J.D.H. Rather, Adiel only sought primary residential custody of his son. Moreover, in Adiel's submission of issues of fact or law to be determined by the district court at trial there was no mention of Monica's religious beliefs or practices.

A 2-day bench trial was held in October 2008. Adiel's counsel made clear in his brief opening statement that, with regard to his case, Monica's religion would be the focus of the trial:

> "There is an issue, Judge, in this case about [J.D.H.'s] well-being, his adaptation to the teachings that his mother is espousing through the Jehovah's Witnesses. And you're going to hear testimony about some of that and how that's affecting [J.D.H.]; how it, as a belief system, they alienate the child from the nonbelieving spouse—from father."

At trial, Adiel testified that Monica was an "unfit" parent, but he relied entirely on nonreligious grounds, such as Monica leaving J.D.H. "alone at home" and "not cleaning him." On cross-examination Adiel explicitly denied that Monica was unfit because she is

a Jehovah's Witness. When pressed on this point, he stated: "I don't think religion has [*sic*] an issue here. You're like identifying the custody with the religion. I don't think religion is the issue here. It's really what's in the best interests of the child."

Nevertheless, when Monica testified, Adiel's counsel began to extensively cross-examine her about Jehovah's Witnesses, and her religious faith and practices. Monica's counsel promptly objected "to any further questions regarding Jehovah's Witness. It has no basis on my direct examination nor on the custody of this child." Adiel's counsel responded:

> "Well, Judge, this would bear upon, not only the fact that she has this child engaged in certain activities . . . . I think it's relevant, her beliefs, as to how she approaches parenting and co-parenting, what she's telling this little boy about Adiel. All of this is relevant. You can weigh all this, Judge."

The trial court overruled the objection, finding the inquiry was "fair cross."

Extensive evidence was presented to the trial court. There was testimony by Monica, her mother, Johnson, Sonya Atencio (a daycare provider), and Shane Vondracek, (J.D.H.'s first grade teacher). Additionally, there was testimony by Adiel, his wife, Adiel's mother and father, and Meighan Peifer (an early childhood special education teacher).

On February 17, 2009, the district court issued a detailed, 14-page memorandum decision. In this decision the court summarized the key issues Adiel had raised in the custody trial:

> "[T]he primary issues raised in this litigation pertain to the Mother's religious practices as a Jehovah's Witness. Father contends that the Mother's religious practices are alienating him from his son. Father further contends that Mother's religious practices are creating problems for his son's social interactions with other children. Next, Father contends that the Jehovah's Witness prohibition on blood transfusion, and the Mother's reluctance to disavow this prohibition as it relates to the possible future medical needs of [J.D.H.], creates an unacceptable risk that [J.D.H.] would not receive medically necessary healthcare. Finally, Father contends that [J.D.H.] is being forced to participate in activities associated with the Jehovah's Witnesses which are not in his best interests."

After a thorough discussion of the law and evidence, the district court concluded:

"This has been a difficult case for the Court. Both parents are capable and loving parents, and both naturally want to be the primary residential custodian for [J.D.H.]. The Court has struggled with this issue . . . . The Court agrees with the assessment of the limited case manager that this is an ideal case for shared custody—however, that is not an option due to the geographic separation of the parents. . . . [T]he Court has concluded that [J.D.H.] is well adjusted to his current living arrangements, and although the Father has raised legitimate concerns, the Court has concluded that it [is] in [J.D.H.'s] best interests to retain primary residential custody with the Mother."

The district court adopted Johnson's recommendations made in his updated limited case manager report of May 16, 2008. In particular, these recommendations included: "The parties should continue to have 'joint' legal custody of [J.D.H.], meaning generally that each party should have equal access to all records and information and equal input on all major decisions pertaining to [J.D.H.] including, but not necessarily limited to, educational, healthcare, extra-curricular and daycare matters." Additionally, Adiel was awarded significant parenting time, including every spring break, summer, and alternating weekends and holidays.

Adiel filed a timely appeal.

## APPELLATE STANDARD OF REVIEW

An appellate court will reverse a trial court's child custody determination only upon an affirmative showing by the appellant that the trial court abused its sound judicial discretion. *In re Marriage of Rayman*, 273 Kan. 996, 999, 47 P.3d 413 (2002) (abuse of discretion standard); see also *Harsch v. Miller*, 288 Kan. 280, 293, 200 P.3d 467 (2009) (burden of proof on party asserting abuse of discretion). In reviewing a trial court's custody determination for an abuse of discretion, our Supreme Court has advised:

"[An appellate court's] function is not to delve into the record and engage in the emotional and analytical tug of war between two good parents over [their child]. The district court [is] in a better position to evaluate the complexities of the situation and to determine the best interests of the child. Unless we were to conclude that no reasonable judge would have reached the result reached below, the district court's decision must be affirmed." *In re Marriage of Bradley*, 258 Kan. 39, 45, 899 P.2d 471 (1995).

Our Supreme Court has explained judicial discretion in this way:

"Judicial discretion will vary depending upon the character of the question presented for determination. Generally, the trial court's decision is protected if reasonable persons could differ upon the propriety of the decision as long as the discretionary decision is made within and takes into account the applicable legal standards. However, an abuse of discretion may be found if the trial court's decision goes outside the framework of or fails to properly consider statutory limitations or legal standards. [Citation omitted.]" *State v. Shopteese*, 283 Kan. 331, 340, 153 P.3d 1208 (2007).

To the extent we must determine the proper framework, statutory limitations, or legal standards, our review is unlimited. See *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 915-16, 157 P.3d 1109 (2007).

### PROPRIETY OF THE LEGAL STANDARD USED BY THE TRIAL COURT TO DETERMINE CUSTODY

For his first issue on appeal, Adiel states:

"This was an initial custody determination. The district court ruled that the father had a burden of proof to alter the *status quo*. The burden was described as 'a compelling reason' to have the *de facto* living arrangement of the minor child changed. The district court ruled the father failed to prove a 'compelling reason.' Did the trial court err?"

Adiel also claims the trial court "improperly overlaid a 'material change of circumstances' analysis that arises in post judgment cases," when this was an initial custody determination. Adiel never raised this multifaceted issue before the district court.

Importantly, Adiel does not provide any reference in the record to support his claims that the trial court issued the specific rulings of which he now complains. Our appellate rules require facts to be keyed to the record on appeal, and "[a]ny material statement made without such a reference may be presumed to be without support in the record." Supreme Court Rule 6.02(d) (2009 Kan. Ct. R. Annot. 38). Moreover, our independent review of the record does not reveal any such rulings by the trial court. In fact, the trial court's memorandum decision did not use the words "burden of proof," "status quo," or "material change of circumstances." Accordingly, Adiel has not provided a sufficient factual record on appeal to support his allegation that the trial court used an improper legal standard in its determination of custody.

Trial courts presented with child custody and residency decisions are required by Kansas statute to use the following legal standard: "*Child custody or residency criteria.* The court shall determine custody or residency of a child in accordance with the best interests of the child." K.S.A. 2009 Supp. 60-1610(a)(3). To guide the trial court in the determination of the best interests of the child, K.S.A. 2009 Supp. 60-1610(a)(3)(B) provides a nonexclusive list of 11 factors that, if relevant, the trial court must consider. See *State ex rel. Secretary of SRS v. Clubb*, 30 Kan. App. 2d 1, Syl. ¶ 3, 39 P.3d 80 (2001).

Our review of the trial court's memorandum decision convinces us the correct legal standard and statutory factors were applied in this case. In particular, in its "Summary of the Court's ruling," the trial court explicitly stated that after weighing the evidence it had reached a conclusion to award Monica residential custody based on "[J.D.H.'s] best interests." This is the correct legal standard. Moreover, the trial court prefaced its detailed findings of fact and conclusions of law by stating: "The factors the Court is required to consider when deciding custody or residency of a child are set forth in K.S.A. 60-1610(a)(3)(B)." Once again, the trial court explicitly identified the proper statutory factors to be considered in the determination of the best interests of J.D.H. The trial court then proceeded to discuss the relevant evidence and its legal conclusions by focusing on each particular statutory factor for which the parties presented evidence. This was an appropriate application of the proper legal standard and statutory factors in this initial custody and residency matter.

Adiel's claims are predicated on the trial court twice using the phrase "compelling reason" when discussing its findings that J.D.H. was "doing well under the current custodial arrangement" and was "well adjusted to his current living environment." Given these findings, the trial court saw no "compelling reason" to change an "arrangement that was working well for [J.D.H.]" and "has existed all of [his] life."

The trial court's choice of words which Adiel challenges was never made in the context of referencing a legal standard. These words were used in the trial court's general discussion of the case.

Moreover, K.S.A. 2009 Supp. 60-1610(a)(3)(B)(v) identifies "the child's adjustment to the child's home, school and community" as a proper factor to consider regarding custody and residency, and the trial court gave "great weight" to the evidence pertaining to this factor. That evidence regarding J.D.H.'s adjustment to his home, school, and community arose from the fact that Monica had primarily resided with, educated, and cared for J.D.H. his entire life. Thus, the "compelling reason" phrase referred to the weight of the evidence in favor of maintaining the existing residency arrangement, not any legal standard itself.

We also find Adiel's claim that the trial court erroneously used a "material change of circumstances" standard that is set forth in K.S.A. 2009 Supp. 60-1610(a)(2)(A), and is employed in those cases wherein a petitioner seeks to "change or modify *any prior order* of custody, residency, visitation and parenting time," to be without merit. (Emphasis added.) As noted earlier, the trial court never mentioned the phrase "material change of circumstances" or intimated that Adiel had the burden to prove that such a material change had occurred in this case in order for Adiel to obtain custody of J.D.H.

We note that when the trial court considered the "[l]ength of time [J.D.H.] has spent with each parent," it apparently conflated the child's adjustment to home under K.S.A. 2009 Supp. 60-1610(a)(3)(B)(v) with the *"length of time* that the child has been under the actual care and control of *any person other than a parent"* under K.S.A. 2009 Supp. 60-1610(a)(3)(B)(i). (Emphasis added.) Adiel contends the trial court thereby impermissibly created a *"super* factor with a built in presumption in favor of *de facto* residency."

To the contrary, the trial court never referenced any such presumption. Moreover, the K.S.A. 2009 Supp. 60-1610(a)(3)(B) factors are not exclusive, and a child's adjustment to home could include the length of time the child spent there—in this case, 6 years. Adiel, for example, repeatedly asserted below that he had spent more time with J.D.H. than Monica alleged. Finally, assuming any error, it was technical and may be disregarded on appeal. See K.S.A. 60-2105 ("The appellate court shall disregard all mere tech-

nical errors and irregularities which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining, where it appears upon the whole record that substantial justice has been done by the judgment or order of the trial court.").

For the first time on appeal, Adiel also complains, in passing, that Johnson's limited case manager reports also "applied a change of custody analysis with a compelling reason factor."

At the outset, Adiel never raised this issue with the trial court. Issues not raised before the trial court may not be raised on appeal. *Miller v. Bartle*, 283 Kan. 108, 119, 150 P.3d 1282 (2007). Second, the contested language which Adiel claims was used by Johnson in his two reports was known to Adiel prior to trial, yet he never raised this issue in the pretrial order or during trial. In fact, Johnson testified at trial and Adiel's counsel never questioned him about referencing improper legal standards in his reports. Third, we note that in the April 19, 2007, report Johnson stated: "Beyond the application of the Statutory factors, the paramount consideration is always what custody/parenting-time arrangement will best serve the interests of the minor child." This is the correct legal standard. Finally, as discussed earlier, we are convinced the trial court used the proper legal standard and statutory factors in this case and there is no showing the trial court relied on Johnson for any legal standards. Accordingly, this issue is not properly before us on appeal and is also without merit.

## PROPRIETY OF THE LEGAL STANDARD APPLIED TO EVIDENCE OF RELIGIOUS BELIEFS AND PRACTICES

Adiel's next two issues relate to the propriety of the legal standard the trial court applied to the evidence of Monica's religious beliefs and practices as a Jehovah's Witness. Adiel first contends the trial court erroneously "erased from the custody consideration all evidence having anything to do with religion." He then focuses on Monica's religious beliefs regarding blood transfusions, claiming the trial court "refused to consider [Monica's] position on refusal to consent to medical treatment for [J.D.H.] because it was motivated by her religious beliefs."

The trial court analyzed the evidence of Monica's religious beliefs and practices based on its understanding of the law as discussed in three Kansas cases, *Jackson v. Jackson*, 181 Kan. 1, 309 P.2d 705 (1957), *Beebe v. Chavez*, 226 Kan. 591, 602 P.2d 1279 (1979), and *Anhalt v. Fesler*, 6 Kan. App. 2d 921, 636 P.2d 224 (1981). As a general proposition, these three cases illustrate the fundamental point that a trial court should not allow "the matter of religion to become an integral part of its determination [in a] custody matter." *Jackson*, 181 Kan. at 8. In all three cases, a Kansas appellate court reversed the trial court because it had changed custody based, in whole or in part, on its judgment about one parent's religious beliefs and practices. See *Beebe*, 226 Kan. at 601-02; *Jackson*, 181 Kan. at 2, 8; *Anhalt*, 6 Kan. App. 2d at 922-24.

In *Jackson*, the father sought a change of custody for his children because the mother was a Jehovah's Witness and " 'by subjecting the children to such teachings, they will tend to become overtired and emotionally upset, and compelled to give attention to religious instruction, within the precepts of said Jehovah's Witness organization, to the end that their physical well being will be adversely affected.' " 181 Kan. at 5.

As in the present case, in *Jackson* "[t]he evidence in the trial was replete with testimony and exhibits as to the tenets of Jehovah's Witnesses and the possible effect of such beliefs upon the children." 181 Kan. at 5. In *Jackson*, this evidence included the mother's refusal to teach the children to salute the American flag, and not allowing the children to exchange gifts at Christmas or participate in Easter egg hunts and other modern day observances. In particular, the trial court noted the 7-year-old son stated that he admired Gene Harvey, described as a Jehovah's Witness who was sentenced to prison for failing to register for military service. The 5-year-old daughter also indicated her opposition to military service by relating teachings from a Jehovah's Witness that graphically described sexual violence that male soldiers inflicted on women.

Our Supreme Court colloquially observed, "In this custody case, the record affirmatively shows religion was in it from the beginning to end." 181 Kan. at 11. The trial court "may have had other good

and sufficient reasons for changing custody," but the Supreme Court concluded "they cannot be distinguished from those of religion." 181 Kan. at 11.

*Jackson* is noteworthy for setting forth the following constitutional tenet in child custody cases:

"Religious freedom, as guaranteed by our Constitution, should be faithfully upheld, and religious teachings to the children by a parent or parents, regardless of how obnoxious the same might be to the Court, the other parent or the general public should not and must not be considered as [the] basis of making child custody orders." 181 Kan. 1, Syl. ¶ 6.

Our Supreme Court also stated:

"[T]he question of religion cannot be regarded by the court in determining the care, custody and control of minor children. The courts have no authority over that part of a child's training which consists in religious discipline, and in a dispute relating to custody, religious views afford no ground for depriving a parent of custody who is otherwise qualified." 181 Kan. 1, Syl. ¶ 5.

Over 20 years later, in 1979, our Supreme Court issued *Beebe*, another precedent relied upon by the trial court in the present case. In *Beebe*, the father of a 12-year-old boy sought to obtain custody from the mother, who was described as a "non-sectarian religious sermonizer" who alternatively lived in Mexico and the United States. 226 Kan. at 595-96. Mother was a believer in an " 'unorthodox religion.' " 226 Kan. at 597. Among other findings, the district judge determined that mother " 'believes God will take care of her and Robert and that she does not believe in medical treatment.' " 226 Kan. at 596. Moreover, " '[mother] interpreted her religion as barring medical treatment for her son.' " 226 Kan. at 596. In *Beebe*, the trial court held: " 'This court is of the opinion that the interests of [the son] be best served if he remained in the United States where he could obtain proper medical treatment and proper schooling and such other advantages as available to a citizen of this country.' " 226 Kan. at 597.

Importantly, our Supreme Court found an insufficient factual basis for the father's concerns that the son had been harmed as a result of inadequate medical care. In particular, the father alleged his son had vision and hearing problems, and inadequate immunizations. The Supreme Court concluded, however, there was no

basis to find the son "was ever neglected" because he did not receive "proper medical treatment." 226 Kan. at 602. In fact, the Supreme Court specifically found the son was "in good physical health." 226 Kan. at 602.

The Supreme Court in *Beebe* then addressed its own rhetorical question:

"[Mother] was not questioned as to her religious beliefs concerning medical treatment, and the evidence of her beliefs is sparse. Assuming, however, that her religion does discourage or prohibit the use of drugs or medications, or treatment by physicians, is that a valid reason to change custody? Christian Science, a denomination with wide membership, has similar teachings; it discourages as unnecessary the use of drugs or treatment by physicians; yet though such beliefs may be 'unorthodox' to the trial judge, they are constitutionally protected and form no basis for denying or changing custody." 226 Kan. at 602.

The Supreme Court then cited *Jackson* as supporting precedent.

Three members of the Supreme Court dissented. Chief Justice Schroeder, writing the dissenting opinion, observed: "The question in this case goes beyond religious freedom. Here the trial court was concerned that [mother's] religious beliefs had led to neglect of [the son's] health. He had vision, hearing and speech impairments . . . ." 226 Kan. at 606 (Schroeder J., dissenting). The Chief Justice concluded: "If the religious beliefs of a parent threaten a child's health or well-being, or would lead to neglect of the child, the adverse effects upon the child may be considered in making a change of custody." *Beebe*, 226 Kan. at 606.

The Court of Appeals decision in *Anhalt* was the third Kansas case relied on by the trial court in the present litigation. In *Anhalt*, the mother was initially awarded custody of the minor children. The father later sought a change of custody. The trial court granted the father's motion in part because the children

" 'have always been raised in the church. They went to the church. Been down there now since March, April, May, June, and they just hadn't got time to get into the church . . . .

" 'I'll tell you. I want them both to be in church, the children and the man. . . .

. . . .

" '. . . I'd like to have them go to church or Sunday school when they're—when they haven't at their mother's . . . .' " 6 Kan. App. 2d at 922.

Our Court of Appeals reversed, finding the trial court "erroneously allowed the matter of religion to be an integral part of its decision to change custody." 6 Kan. App. 2d at 922-23. Citing *Jackson* and *Beebe*, our court concluded that the order changing custody "based primarily on the matter of religion is not proper." *Anhalt*, 6 Kan. App. 2d at 924.

*Jackson*, *Beebe*, and *Anhalt* demonstrate Kansas appellate courts' reluctance to deprive a parent of one constitutionally protected right—the care, custody, and control of children—based on the parent's exercise of another constitutionally protected right—the free exercise of religion. See *In re J.D.C.*, 284 Kan. 155, 166, 159 P.3d 974 (2007) ("A parent's right to make decisions regarding the care, custody, and control of his or her child is a fundamental liberty interest protected by the Fourteenth Amendment. [Citations omitted.]"); *State ex rel. Pringle v. Heritage Baptist Temple, Inc.*, 236 Kan. 544, Syl. ¶ 1, 693 P.2d 1163 (1985) ("The First Amendment to the United States Constitution and Section 7 of the Kansas Bill of Rights prohibit governmental establishment of religion and guarantee the free exercise of religion by all persons."). In the present case, the trial court's memorandum decision properly showed the same thoughtful disinclination to deprive Monica of her fundamental liberty interest in having care, custody, and control of J.D.H. because she exercised her fundamental right to the free exercise of religion.

Nevertheless, "[t]he welfare of children" is also "a matter of State concern." *In re J.D.C.*, 284 Kan. at 166. Although the First Amendment guarantees "freedom to believe," the corresponding "freedom to act is subject to governmental regulation for the protection of society." *State ex rel. Pringle*, 236 Kan. 544, Syl. ¶ 2. This principle was best articulated by our Supreme Court in the context of a custody case, *Sinclair v. Sinclair*, 204 Kan. 240, 461 P.2d 750 (1969).

*Sinclair* was decided 12 years after *Jackson* and 10 years prior to *Beebe*. It was a divorce action wherein the father sought custody of the couple's two children, 13 and 18 years of age. The Sinclairs' 20-year marriage was described as "reasonably tranquil" until the mother "became interested in the teachings of Jehovah's Witnesses

and began studying the Bible." 204 Kan. at 241. Subsequently, the mother "became inattentive to the children and lost interest in their school activities" and "completely neglected her duties" as a mother. 204 Kan. at 242. Ultimately, the mother abandoned the home, moved to Montana, and upon her return to Kansas lived apart from the family. In particular, our Supreme Court noted, the mother "maintained little or no contact" with the family and "did not so much as attend [her oldest son's] graduation exercises." 204 Kan. at 241. The trial court granted the father custody of his sons. 204 Kan. at 244.

On appeal, the mother claimed error because, contrary to *Jackson,* the trial court's "decision was based solely on the ground of religion." 204 Kan. at 244. Our Supreme Court disagreed, however, and clarified *Jackson*: "The import of our holding in *Jackson* was that religious views alone afford no ground for depriving custody to a parent who is otherwise qualified. Here, the religious beliefs of [mother] precipitated a course of action on her part of utter disregard and indifference to her children and their activities." 204 Kan. at 244. In this regard, the Supreme Court highlighted evidence that "after [the mother] left home in February 1967 she did not contact the boys for nearly six months, and thereafter no more than three times until the time of the divorce in February 1968." 204 Kan. at 244. Emphasizing the "paramount consideration of the court in custody cases between parents is always the welfare and best interests of the children," our Supreme Court affirmed the change in custody. 204 Kan. at 244.

*Sinclair* teaches that while religious views and practices alone may not be considered in a child custody case, Kansas courts may consider the parent's "utter disregard and indifference" to children where religious beliefs "precipitated" that parent's neglect of the children. 204 Kan. at 244. *Sinclair* is an example of a court making the distinction between State disapproval of religion, which is improper under our constitution, and State disapproval of actual harm suffered by children as a result of religious beliefs and practices.

This understanding of *Sinclair* is consonant with *Jackson, Beebe,* and *Anhalt*. In *Jackson,* the Supreme Court's focus was on one parent's religious beliefs and teachings. Although the noncustodial

parent claimed the children's "well being will be adversely affected" by unorthodox religious teachings, there was no evidence the children had sustained any actual harm to their health or welfare. 181 Kan. at 5. Similarly, in *Anhalt*, there was no evidence of harm because the children did not regularly attend church. Both of these factual scenarios, however, obviously pale in significance compared to *Sinclair*, wherein the Supreme Court found obvious harm to the children given their mother's abandonment of them as a result of her religious beliefs.

We view *Beebe*, the latest opinion issued by our Supreme Court to address this issue, as similarly in accord with *Sinclair*. In *Beebe*, although the trial court had found otherwise, our Supreme Court concluded there was no evidence the child was neglected by his mother's alleged failure to provide proper medical treatment. *Beebe*, 226 Kan. at 602. Indeed, the Supreme Court concluded that the son was " 'in good physical health.' " 226 Kan. at 602. Significantly, in *Beebe*, the majority's focus was on the fact that, contrary to the dissent's view, it believed the son's health had not been harmed by his mother's religious beliefs and practices. Again, this factual context was wholly unlike *Sinclair*, where the harm of maternal abandonment was obviously egregious.

In summary, Kansas law provides that a parent's religious beliefs and practices may not be considered by the trial court as a basis to deprive that parent of custody unless there is a showing of actual harm to the health or welfare of the child caused by those religious beliefs and practices.

Adiel contends the trial court, which did not cite to *Sinclair*, misinterpreted *Jackson, Beebe*, and *Anhalt* and, as a consequence, improperly "rejected all evidence from the custody consideration that had anything to do with religion." Adiel's contention is overstated and without merit.

We conclude the trial court appropriately followed the *Jackson, Beebe*, and *Anhalt* line of precedent and properly applied that precedent to the evidence admitted at trial. Moreover, our review of the trial court's factual findings and record evidence convinces us that, unlike *Sinclair*, Adiel failed to make a showing that J.D.H. was actually harmed by Monica's religious beliefs and practices. To

the contrary, there was substantial competent evidence to support the trial court's discretionary judgment that it was in the best interests of J.D.H. for Monica and Adiel to share joint legal custody, and to award Monica primary residential custody.

On appeal, Adiel focuses on four subject areas wherein he alleges the trial court erroneously disregarded any evidence related to Monica's religious beliefs and practices, and the harm or possible harm to J.D.H. which accrued as a result of those beliefs and practices: (1) religious activities; (2) social alienation; (3) parental alienation; and (4) blood transfusions. We will address each of these subject areas in order.

*Religious Activities*

At trial, Adiel argued that Monica's door-to-door proselytizing with J.D.H. was injurious to his welfare. The trial court made the following factual findings:

"[J.D.H.] reports that he does not like to go with Mother on weekends when she goes door to door to visit with others about her faith. Evidence presented at trial was that these weekend exercises sometimes last up to five hours.

"It is understandable that [J.D.H.] would be reluctant to participate with Mother in these activities. However, Kansas case law prohibits the Court from considering these factors. It is not unusual for children to want to do other things than those associated with church. The fact that [J.D.H.] would rather do something he considers to be more fun than walking door to door with his mother on behalf of the Jehovah's Witnesses is normal. Despite the fact that [J.D.H.] does not like to participate in certain church related activities, *he is still bonded to his mother, and these activities do not appear to have any adverse impact on [J.D.H.].*" (Emphasis added.)

The trial court's findings show its disinclination to consider an established religious practice of Jehovah's Witnesses, especially when the court found there was no showing of any harm to J.D.H. Contrary to Adiel's claims, the italicized portion of the trial court's findings would have been superfluous if the trial court believed that under Kansas law actual harm caused by religious beliefs and practices was beyond its consideration. These findings support our conclusion that the trial court applied the appropriate legal standard in considering the evidence of Monica's religious beliefs and

practices and the lack of evidence of any actual harm to J.D.H. caused by those beliefs and practices.

*Social Alienation*

Adiel alleges "[t]he evidence rejected by the trial court demonstrated that [Monica's] beliefs caused or contributed to [J.D.H.] becoming increasingly dysfunctional and abnormal . . . ." Additionally, Adiel describes J.D.H. as "almost catatonic when certain circumstances presented themselves." Given the trial court's factual findings and the supporting record evidence, Adiel's claims are more hyperbole than an accurate characterization of the evidence.

The trial court found J.D.H. was "experiencing some anxiety at school in connection with school related celebrations of certain holidays." In this regard, Monica testified that Jehovah's Witnesses do not celebrate holidays such as birthdays, Thanksgiving, Christmas, Veterans Day, and Presidents Day, and that they may not pledge allegiance to the United States or salute a flag.

The evidence on this issue was conflicting. Meighan E. Peifer, an administrator of a child-care facility J.D.H. attended while in Adiel's care, testified that J.D.H. (who was then 5 years old) became highly anxious when directed to participate in a Fourth of July parade in 2007. J.D.H. refused to participate, saying that "my mom said it was wrong." Peifer also testified that J.D.H. "froze" twice, once when he was in a play and another time when he was invited to a sleepover. J.D.H. was only 3 or 4 years old at the time, and Peifer admitted J.D.H.'s reactions could have been stage fright or uncertainty caused by new social situations.

On the other hand, Shane Vondracek, J.D.H.'s first grade teacher in the fall of 2008, testified that J.D.H. and two other students who do not celebrate holidays are separated during the celebrations and given other activities. Vondracek testified that when these celebrations occurred at school J.D.H. had never acted in a manner that caused him any concern.

The trial court observed: "While this is a concern to the Court, ultimately the Court must respect [Monica's] religious practices. Case law which is binding precedent on this Court prohibits consideration of matters directly associated with decisions a parent

makes in an effort to put into practices the teachings of that parent's faith." Clearly the trial court's "concern" indicates that it considered the evidence of anxiety. Ultimately, however, the trial court determined that J.D.H. "is well adjusted to his school, and is a very successful student. He is participating in the gifted program at Adams Elementary School, and is involved in various after school activities." In short, the trial court found J.D.H.'s incidental instances of apprehension did not adversely affect his education or social interaction.

These were not *Sinclair*-type facts. The evidence of J.D.H.'s occasional anxious moments at daycare or school was insignificant in comparison to the sort of actual harm which our Supreme Court found was sufficient in *Sinclair* to override the parent's liberty interest in having the care, custody, and control of her child. It is understatement to observe that any 3-, 4-, or 5-year-old child might react similarly if he or she were faced, perhaps for the first time, with refusing participation in an event outside the home for which other children were participating. Moreover, if a very young child's occasional anxiety was a factor in custody determinations, adherents of minority religions (or even of a majority religion with different values than those held by the participants in such celebrations) would be at a permanent disadvantage in custody and residency determinations. Given the minimal and controverted nature of this particular evidence—especially in light of the overwhelming evidence that J.D.H. was well-adjusted and excelling in school—the trial court properly opted to respect Monica's religious freedom.

### Parental Alienation

Adiel next complains of the following excerpt from the trial court's memorandum decision: "The teachings of the Jehovah's Witnesses, including those that teach non-Jehovah's Witnesses will suffer annihilation, may not be considered by this Court in deciding custody issues." Based on this statement, Adiel claims the trial court ignored evidence that these religious doctrines were harming J.D.H., specifically, "the alienating affect [*sic*]" of the "teaching"

that Adiel is " 'God's foe' and a 'non-believer' who will eventually have his head chopped off."

The trial court did not make specific findings on this evidence Adiel cites in support of his argument. Where a party has failed to object to inadequate findings—as Adiel failed to do—an appellate court ordinarily presumes the trial court found the facts necessary to support its judgment. See *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009). Still, we will briefly set out the evidence for purposes of our discussion.

The reference to heads being chopped off was found in a report by Twila S. Hindery, a social worker. Adiel had retained Hindery during this litigation to interview J.D.H. without Monica's knowledge or consent. The trial court first ruled the report was hearsay and would not be considered unless Hindery testified. Hindery did not testify and Johnson was unable to personally contact Hindery about her report, but the trial court eventually admitted it because Johnson had considered it in preparing his report.

Hindery's report stated J.D.H., who was 5 years old at the time, "talks calmly about people getting their heads chopped off in the 'end times.' " The report did not provide the source of J.D.H.'s belief, but Hindery seemed to attribute it to Monica. Adiel's counsel cross-examined Monica on this topic:

"Q. And don't the Jehovah's Witness teachings, don't they teach that nonbelievers will die in cataclysmic event [*sic*]?

"A. No.

"Q. And they don't teach that the unbeliever is gonna [*sic*] have their heads cut off[?]

"A. No.

"Q. So, if [J.D.H.] said this, you have no idea where he would have come up with that idea[?]

"A. If [J.D.H.] said it, then, no."

Another exchange between Monica and Adiel's counsel was similar: Adiel's counsel asked, "But, as a teaching, [Adiel's] an unbeliever; right?" Monica replied, "As a teaching, he's [J.D.H.'s] father."

With respect to the "God's foe" label, Monica defined the term as someone who "intentionally tries to persecute Jehovah's Witnesses." Adiel's counsel, however, never established that Adiel ever

attempted to persecute Jehovah's Witnesses or that Monica considered Adiel to be "God's foe." To the contrary, during Monica and Adiel's relationship, on at least two occasions, Adiel attended the Jehovah's Witnesses' Kingdom Hall. And Adiel testified he had never tried to prevent J.D.H. from having a belief in the Jehovah's Witness faith. Finally, there was no evidence Monica taught J.D.H. that his father should be thought of as "God's foe."

Significantly, when Adiel testified at trial, he was asked the following by his counsel: "[H]as [J.D.H.] ever told you that you're not a believer, or you're going to hell or annihilated, or . . . I mean, has he ever said any of those things to ya [*sic*], that you can recall?" Adiel responded:

"You know, years ago—this is—around 2007, that's when I started to kinda hear a little bit about kind of what he's learning. Umm, he doesn't—he believes that I'm gonna be in trouble if I celebrate birthdays, umm, things like that. I mean. But not—you know, not in those words, you know, you gonna be annihilated, you know, or something like that."

After considering this evidence the trial court observed:

"[A]lmost all religions are exclusive of other religions. The fact that Jehovah's Witnesses believe that only they will survive annihilation is not a doctrine unique to that religion. If a parent wants to raise a child as a Jehovah's Witness, it is reasonable to expect that child to believe that bad things happened to people who are not Jehovah's Witnesses when they die."

Critical to the issue of parental alienation, the trial court found: "It is not clear from the evidence whether [J.D.H.'s] comments about his father are coming from things he is taught at church, or whether they are coming from [Monica]." In short, the trial court specifically considered but was unable to find that Monica used her religious beliefs in an attempt to alienate J.D.H. from his father.

In discussing the proper legal standard to be applied, the trial court also noted: "While the right of a parent to guide and train their children in matters of religion has been zealously protected by the court, *a parent may not hide behind the curtain of religion to alienate a child from the other parent.*" (Emphasis added.) We would not expect this statement if the trial court thought, as Adiel asserts, that *Jackson, Beebe,* and *Anhalt* stood for the proposition

that "anything to do with religion," regardless if there is actual harm to a child (such as parental alienation), may not be considered by the trial court in custody determinations.

With regard to allegations that Monica's religious teachings and other conduct alienated J.D.H. from his father, the trial court ultimately determined that "[J.D.H.] has a healthy relationship with his father. . . . [J.D.H.] loves his father, he looks forward to spending time with him, and he has no hesitation communicating with his father over the telephone (despite the fact that such conversations are being recorded)." Of course, these findings would have been superfluous if the trial court believed, as Adiel alleges, that under Kansas law actual harm caused by religious beliefs and practices was beyond its consideration.

Once again, these were not *Sinclair*-type facts. The evidence supported only what the trial court found: J.D.H. had internalized some of Monica's religious beliefs regarding the afterlife, and the son was concerned about his father because of those beliefs. Until the courts decide what awaits after death, we know of no basis to weigh such doctrines against a parent in custody determinations. The trial court correctly applied the legal standard established in *Beebe, Jackson,* and *Anhalt.*

*Blood Transfusions*

Adiel complains that Monica "expressed a position about the medical treatment of [J.D.H.] which was that in the future she would not consent to lifesaving treatment for [J.D.H.] if it involved a blood transfusion." Adiel believes the trial court committed error in not considering Monica's "philosophy about the future medical treatment of [J.D.H.]" Monica advises, in her appellate brief, that "Jehovah's Witnesses refuse blood transfusions as the Bible commands to abstain from blood. *See Acts* 15:29; *see also Genesis* 9:3, 4; *Leviticus* 7:26, 27; 17:1, 2, 10-12; *Deuteronomy* 12:23-25."

The trial court observed that "the practice by Jehovah's Witnesses prohibiting the use of blood products" was a "greater concern" than Monica's other religious beliefs and practices. The trial court found that "if [J.D.H.] is ever involved in a car accident or some other traumatic event, [Monica's] religious beliefs would pre-

vent her from approving a blood transfusion or the use of blood products that may be necessary to save [J.D.H.'s] life." Moreover, the trial court found that Monica "was not going to disavow the teachings of the Jehovah's Witnesses on the use of blood products."

Preliminarily, there was no evidence that J.D.H. was ever denied a blood transfusion, was in need of a blood transfusion, or had a health condition that predisposed him to blood transfusions as a necessary medical procedure. Indeed, the hypothetical nature of this issue is conceded by Adiel: "This is a future issue because there was no evidence presented to the trial court that [J.D.H.] now needed a blood transfusion or had any special medical condition that would immediately warrant such a transfusion."

Adiel presented no testimony, expert or otherwise, that established the indispensible necessity for blood transfusions under certain circumstances. On the other hand, the only evidence presented at trial regarding the use of blood transfusions was Monica's repeated testimony that, to her knowledge, there are "bloodless therapies" available in lieu of blood transfusions. In this regard, at the time of trial Monica was a licensed practical nurse employed at Galichia Heart Hospital and was also studying for her bachelor's degree in nursing.

When pressed, on cross-examination, about a hypothetical circumstance involving J.D.H. needing a blood transfusion, however, Monica testified, "[W]hat I would do is talk to his father. Me and Adiel would have a conversation regarding it." Monica was then asked by Adiel's counsel: "[I]f you wouldn't consent, what would be the use of talking to Adiel, his father? What would you talk about?" Monica responded: "That would be the use. He's [J.D.H.'s] father."

In discussing the legal standard to be applied in evaluating Monica's religious beliefs regarding the use of blood products, the trial court stated that it considered a Vermont case cited by Adiel, *Meyer v. Meyer*, 173 Vt. 195, 789 A.2d 921 (2001), to be "very persuasive" and yet inconsistent with Kansas law as enunciated by *Beebe*.

In *Meyer*, the parents had joint custody of two daughters after a divorce. Four years later, the mother moved for sole custody.

The father was a Jehovah's Witness, and "[m]other presented extensive evidence that the conflicting practices and rules in each household that stemmed from her and father's disparate religious beliefs were causing [the children] to experience extreme confusion and anxiety." 173 Vt. at 199. In particular, one of the children was experiencing symptoms of anxiety, including nightmares, stomach aches, and a constricted throat. The Supreme Court of Vermont rejected father's argument that consideration of his religion was "unconstitutional per se." 173 Vt. at 198. It ruled "courts may take into account a parent's religious practices when making a custodial determination if there is evidence that the practices have a direct and negative impact on the child's physical or mental health. [Citations omitted.]" 173 Vt. at 198.

The trial court in the present case contrasted *Meyer* with *Beebe* based on a statement made by the Kansas Supreme Court that beliefs which discourage or prohibit medical treatment "are constitutionally protected and form no basis for denying or changing custody." *Beebe*, 226 Kan. at 602. The trial court then stated: "If, under the *Beebe* case, the Court is not allowed to take into consideration a religious practice that discourages treatment by physicians, the Court does not believe that it may consider in this case [Monica's] religious views which prohibit the use of blood products." The trial court then added the following footnote:

"With all respect to the appellate courts, perhaps it is time to revisit this rule. While judges understandably wish to avoid becoming entangled in religious disputes between the parents, ultimately the duty of the trial court in a child custody case is to protect the best interests of the child. Clearly, if a child is denied necessary medical care for reasons having nothing to do with religion the Court could, and should, consider this when making custody decisions. If a child is denied, or would be denied, life saving medical treatment, should it matter why?"

Of course, in this case, there was no showing that J.D.H. had ever been denied any form of medical treatment—lifesaving or otherwise. It is also unnecessary to revisit the rule from *Beebe* in those circumstances—unlike the present case—where lifesaving medical care is denied, because *Sinclair* remains good law.

With regard to lifesaving medical care which "would be denied," in the future, this possibility of harm is not addressed by either

*Sinclair* or *Meyer*, which dealt with existing, actual harm to children. *Beebe* then comes into play, and where—as in J.D.H.'s situation—a child is "in good health," is "not neglected," and needs "no medical care," our Supreme Court held that a parent may not be denied custody simply because he or she may deny medical care to his or her children in the future based on religious reasons. *Beebe v. Chavez*, 226 Kan. 591, 602, 602 P.2d 1279 (1979); see also *Osier v. Osier*, 410 A.2d 1027, 1031 n.6 (Me. 1980) (where Jehovah's Witness parent would withhold blood transfusions, court may not deny custody unless the religious practice poses "an immediate and substantial threat to the temporal well-being of the child").

We do not view the trial court's ruminations in its footnote as indicative of misunderstanding Kansas law. The trial court's apparent wish that the rule from *Meyer* (a case where actual harm to children was shown) would be applied in cases like *Beebe* or the present case (where actual harm was not shown) does not show it misunderstood Kansas law. Rather, it shows the trial court understood Kansas law but would expand its reach to allow trial courts to consider those instances wherein a parent's religious beliefs prohibiting the use of blood products in the future may be considered by the trial court without the necessity of showing actual harm to the child. We decline the trial court's invitation to expand upon Kansas law because we are bound by the precedent of our Supreme Court. See *Buchanan v. Overley*, 39 Kan. App. 2d 171, 175-76, 178 P.3d 53, *rev. denied* 286 Kan. 1176 (2008).

We are left, then, with the trial court's finding that "there is no evidence that [J.D.H.] is suffering from neglect. He is in good health, he is being well fed, he is appropriately attired, and there is no evidence that any of his teachers have expressed any concern about his physical health or appearance." In short, this issue was controlled by *Beebe*, not *Sinclair*, and the trial court, therefore, applied the correct legal standard in its consideration of the issue of blood transfusions.

## ADIEL'S REQUEST FOR SOLE LEGAL CUSTODY

In conclusion, it is important to notice the relief which Adiel

now seeks in this litigation and the relief which was ordered by the trial court. In Adiel's proposed pretrial order which the trial court adopted, Adiel did not request sole legal custody of J.D.H. Rather, Adiel sought "primary residential custody." Similarly, in his opening statement at trial, Adiel's counsel sought residential custody. For the first time during trial, however, Adiel's counsel established through direct examination of Adiel that he was now seeking sole legal custody because it was important for him "to have the ability to try to make the general decisions." Adiel maintains this position on appeal, although the Kansas Legislature has clearly indicated a "preference" for joint legal custody rather than sole legal custody. K.S.A. 2009 Supp. 60-1610(a)(4).

While Adiel seeks sole legal custody, under the trial court's order from which he appeals, Adiel now has "equal rights to make decisions in the best interests of the child." K.S.A. 2009 Supp. 60-1610(a)(4)(A). In particular, the trial court specifically ordered that both Monica and Adiel "have equal access to all records and information and *equal input on all major decisions* pertaining to [J.D.H.] including, but not necessarily limited to, educational, *healthcare*, extra-curricular and daycare matters." (Emphasis added.)

Kansas law providing for joint legal custody, as implemented in the current custody order, provides Adiel with the identical valuable rights which Monica possesses to make joint decisions in the best interests of their son. Herein is the significance of Monica's answer to the question posed by Adiel's counsel regarding blood transfusions when he asked: "[I]f you wouldn't consent, what would be the use of talking to Adiel, his father?" Monica replied, "That would be the use. He's [J.D.H.'s] father." Indeed, and under the current custody order, Adiel should be consulted because as J.D.H.'s father the trial court has afforded him with an equal right to decide whether J.D.H. should receive a blood transfusion or any other medical procedure. Moreover, K.S.A. 38-122 provides that "*[a]ny parent* . . . whether married or unmarried, *may consent to the performance upon his or her child of a medical, surgical or post mortem procedure* by a physician licensed to practice medicine or surgery." (Emphasis added.)

Importantly, if Adiel cannot agree with Monica on a major decision involving, among other things, J.D.H.'s medical care, education, extracurricular activities, or daycare, Adiel may seek a specific remedy in court. See *Yordy v. Osterman*, 37 Kan. App. 2d 132, 133-35, 149 P.3d 874 (2007) (district court has authority to decide between secular and religious schools, based on best interests of child, where parents with joint legal custody cannot agree). District courts are frequently called upon to make important decisions when divorced parents are unable to agree on their child's best interests.

Finally, the trial court concluded that "[b]oth parents are capable and loving parents." Undoubtedly, this finding was made because there was substantial competent evidence that J.D.H. is a healthy, happy, well-adjusted, and intelligent 6-year-old boy who obviously loves both his parents. Under these circumstances, we conclude the trial court's order of joint legal custody with residential custody awarded to Monica was not arbitrary, fanciful or unreasonable, or a decision in which no reasonable person would take the view adopted by the district court. See *Harsch v. Miller*, 288 Kan. 280, 293, 200 P.3d 467 (2009); *In re Marriage of Bradley*, 282 Kan. 1, 7, 137 P.3d 1030 (2006). To the contrary, we hold the trial court's order was an appropriate exercise of judicial discretion.

Affirmed.

* * *

CAPLINGER, J., dissenting: I respectfully disagree with the majority's conclusion that the district court did not abuse its discretion in deciding primary residential custody in this case. I would remand this case to the district court based on the district court's failure to fully and consistently apply the "best interests of the child" standard in determining residential custody. Further, remand is appropriate because the district court erroneously concluded it could not consider factors relating to a parent's religious practices, even if those practices adversely impacted the child's interests.

## Propriety of Legal Standard Applied by the District Court

Initially, I disagree with the majority's conclusion that despite the district court's multiple references to an improper legal standard, the court's custody determination may nevertheless be affirmed.

As Father points out in his response brief, in its written order awarding residential custody to Mother, the district court referred on several occasions to the recommendations of the limited case manager (LCM). In fact, the court ultimately adopted the recommendations of the LCM, "as set forth in the updated LCM report dated May 16, 2008." This decision was incorrect for two reasons.

First, the LCM testified that Mother should be awarded residential custody because there was no compelling reason to change an arrangement that was working well for the child. Significantly, before considering the factors set forth in K.S.A. 60-1610(a)(3)(B), the district court referred to this the incorrect legal standard cited by the LCM. The court then compounded this error by noting that while Father challenged the LCM's conclusions with evidence he contended demonstrated he was better suited to be the child's primary residential custodian, "[m]ost, but not all, of these factors are tied to Mother's religious practices." As will be discussed below, this too, was an erroneous legal conclusion.

Further, in adopting this "no compelling reason" standard the court explicitly ignored the LCM's testimony at trial in which the LCM changed his recommendation based upon Mother's testimony regarding the use of blood products. As the district court noted, the LCM ultimately recommended that because both parents were appropriate residential custodians, Father should be awarded residential custody based upon Mother's views founded upon her religious practice. Nevertheless, the district court again erroneously determined that it was "bound by precedent which prohibits consideration of this factor."

The majority concludes that the district court's references to this "no compelling reason" standard merely referred to the weight of

the evidence in favor of maintaining the existing residency arrangement, not any legal standard itself. The error in the majority's conclusion, however, is revealed in the district court's concluding paragraph, in which the court emphatically states: "Once the court sifts through *those factors which can be considered in a custody case*, the Court reaches the *same conclusion as the limited case manager's written recommendation*. There is *no compelling reason to significantly change* the arrangement that has existed all of [J.D.H.'s] life."

Unlike the majority, I would not attempt to minimize the district court's multiple references to the incorrect legal standard, particularly when the court initiated and concluded its analysis with these incorrect statements, clearly indicating its reliance on that standard. Instead, I would remand this case to the district court with instructions to consistently apply the "best interests of the child" standard to this initial custody determination.

Further, as discussed below, the district court's application of the incorrect legal standard is irreversibly intertwined with its erroneous legal conclusion that a parent's religious practices may not be considered in a custody determination regardless of their impact upon the best interests of the child.

## FAILURE TO CONSIDER EVIDENCE RELEVANT TO "BEST INTERESTS OF CHILD"

I also disagree with the majority's conclusion regarding the extent to which one parent's religious practices may be considered by the district court in determining primary residential custody, and I would find the district court erred in refusing to consider evidence of religious practices to the extent it pertained to the court's determination of the best interests of the child.

Specifically, I cannot reconcile the majority's analysis of our Supreme Court's holding in *Sinclair v. Sinclair*, 204 Kan. 240, 461 P.2d 750 (1969), with the district court's paramount obligation to consider the child's best interests in making a custody determination.

The majority correctly recites *Sinclair's* synopsis of the court's holding in *Jackson v. Jackson*, 181 Kan. 1, 309 P.2d 705 (1957):

"The import of our holding in *Jackson* was that *religious views alone* afford no ground for depriving custody to a parent who is otherwise qualified." (Emphasis added.) *Sinclair*, 204 Kan. at 244. The majority further recites *Sinclair*'s recognition that *Jackson* emphasized that the "paramount consideration of the court in custody cases between parents is always the welfare and best interests of the children." 204 Kan. at 244.

Despite this recognition of the trial court's overriding obligation to determine the welfare and best interests of the child, the majority nevertheless restricts *Sinclair*'s conclusion as follows: "*Sinclair* teaches that while religious views and practices alone may not be considered in a child custody case, Kansas courts *may consider the parent's 'utter disregard and indifference'* to children where religious beliefs 'precipitated' that *parent's neglect* of the children. [Citation omitted.]" (Emphasis added.) Finally, the majority concludes, "In summary, Kansas law provides that a parent's religious beliefs and practices may not be considered by the trial court as a basis to deprive that parent of custody unless there is a showing of actual harm to the health and welfare of the child caused by those religious beliefs and practices."

The majority then proceeds to analyze the evidence presented in this case with respect to Mother's religious practices and to eventually conclude that Father failed to prove that any of Mother's actions caused actual physical or emotional harm to the child.

I would hold that *Sinclair* means what it says—*i.e.*, that "religious views *alone* afford no ground for depriving custody to a parent who is otherwise qualified." 204 Kan. at 244. And while the evidence in *Sinclair* established that the mother's religious beliefs "precipitated a course of action on her part of utter disregard and indifference to her children and their activities," 204 Kan. at 244, the court in that case did not restrict the trial court's consideration to such egregious circumstances. Instead, the court emphasized that the trial court's "paramount consideration" in a custody case is always the welfare and best interests of the child. 204 Kan. at 244; see also *Anhalt v. Fesler,* 6 Kan. App. 2d 921, 923, 636 P.2d 224 (1981) ("Religion and church attendance, *although factors to*

*be considered, are not* alone sufficient to determine the best interests of minor children." [Emphasis added.]).

In this regard, it is important to remember that custody disputes involve two parents—two parents who each have a fundamental right to exercise the care, custody, and control of their child. By concluding that one parent's religious practices may not be considered in a custody determination unless those practices are shown to cause actual physical or emotional harm to the child, the majority has gutted the straightforward "best interests" standard. Further, the majority has essentially judicially mandated a preference for one parent's fundamental right to the free exercise of religion over another parent's fundamental liberty interest in exercising the care, custody, and control of the child. This cannot be the import of our case law on this difficult issue.

Thus, I would hold that to the extent one or both parents' religious views and practices impact upon the child's best interests, they are admissible and should be considered, along with all other evidence, by the trial court in making a custody determination.

### District Court's Application of Applicable Factors

Although the district court made numerous statements regarding its inability to consider mother's religious practices and strongly qualified its ultimate conclusion based upon this perceived prohibition, the majority nevertheless concludes the district court's ultimate determination is sound. The majority reasons that the district court appropriately based its determination upon all of the facts presented to the court, including those the court explicitly found it could not consider.

A review of the district court's numerous statements regarding its inability to consider evidence of the effect of Mother's religious practices upon the child reveals that this case should be remanded to the district court with instructions to consider the best interests of the child in light of all of the evidence presented.

First, regarding Father's assertion that Mother's religious beliefs as they related to prohibition on celebratory events were disruptive to the child's social development, the district court recognized that Father presented evidence concerning anxiety experienced by the

child in connection with celebration of holidays. However, the court simply concluded: "Case law which is binding precedent on this Court prohibits consideration of matters directly associated with decisions a parent makes in an effort to put into practices the teachings of that parent's faith."

Regarding Father's assertion that Mother's religious beliefs would prevent her from approving a blood transfusion, the trial court stated that "it was clear to the court that Mother was not going to disavow the teaching of the Jehovah's Witnesses on the use of blood products." In a footnote, the court found that these views would require mother to "deny blood products to her son under any medical circumstances." Further, the court recognized that the LCM acknowledged at trial that "given the fact that either parent would be an appropriate residential custodian, the fact the Mother would not approve of the use of blood products would cause him to favor Father as a residential custodian."

Despite the district court's obvious concern regarding Mother's religious views prohibiting the use of blood products, the court concluded it was "bound by Kansas case law which prohibits consideration of the beliefs of the Jehovah's Witnesses, even insofar as these beliefs impact decisions made as to the future medical care and treatment of the minor child."

Regarding Father's concerns regarding the detrimental effect of the child's exposure to Jehovah's Witnesses activities, including up to 5 hours at a time of door-to-door proselytizing, the district court again concluded: "Kansas case law prohibits the Court from considering these factors." Nevertheless, the court then appeared to consider this factor in isolation and determine that it did not "appear to have any adverse impact" on the child.

Regarding Father's complaints that mother's religious teachings have resulted in the child's alienation from his father, the district court commented: "This is a particularly thorny issue for the Court to wade through." The court resolved what it termed a "jurisprudential quagmire" by concluding that religious beliefs: "no matter how unorthodox, are constitutionally protected." Finally, the court stated, "The teachings of the Jehovah's Witnesses, including those that teach non-Jehovah's Witnesses will suffer annihilation, may

not be considered by this Court in deciding custody issues." Despite these pronouncements, the district court then discussed some of the evidence concerning this issue and ambiguously concluded it was unclear from the evidence whether the child's concerns regarding his father's potential demise were "coming from things he is taught at church, or whether they are coming from Mother." In any event, believing it was unable to consider religious practices, the district court ultimately cautioned Mother to "respect the bond" between Father and child.

Significantly, the district court then proceeded to consider other acts of alienation committed by Mother as alleged by Father—acts unrelated to religious practice—and concluded: "Although the court has concerns, Father has not established alienation to such a degree that justifies a change in custody."

Finally, the district court's conclusory paragraphs highlight the court's struggle with its perceived inability to consider religious practices and their effect upon the child. In its conclusion, the court initially states: *"Once those factors related to religion are removed from this case,* what is left is a very bright little boy who is well adjusted to his current living environment." (Emphasis added.)

In the second concluding paragraph, the court again prefaces its remarks with the statement: *"Once the court sifts through those factors which can be considered in a custody case,* the Court reaches the same conclusion as the limited case manager's recommendation [as set forth in its report of May 16, 2008]." Importantly, the court then notes in a footnote that at trial, LCM altered his recommendation to conclude residential custody should be awarded to Father based upon Mother's testimony concerning the use of blood products, but the court restated its belief that it was "bound by precedent which *prohibits consideration* of this factor." The court then concludes: "As such, the limited case manager's revised recommendation is of little use since it depends in no small part on consideration of factors which the Court constitutionally may not take into account."

Despite the district court's numerous statements regarding its inability to consider mother's religious practices or their effect

upon the child, as well as the court's strong qualification of its ultimate conclusion based upon this same prohibition, the majority nevertheless concludes the district court's ultimate determination is sound. Further, the majority reasons that the district court appropriately based its determination upon all of the facts presented to the court, including those the district court explicitly found it could not consider.

Unlike the majority, I would not attempt to dissect and then reconstruct the district court's custody determination. Instead, I would simply recognize that the district court erred in two significant respects: (1) in ultimately considering whether there was a "compelling reason" to alter the status quo with respect to residential custody instead of applying the "best interests" standard; and (2) in ruling that Kansas law did not allow it to consider evidence relating to the effect of a parent's religious practices in making its custody determination.

I would remand this case to the district court for consideration of *all* of the evidence relevant to the child's best interests, including but not limited to the impact of either or both parents' religious practices. In making this determination, the district court should be mindful not to consider any factor in isolation or permit either parent's religious practices to be the sole deciding factor in the custody determination. Further, the court should be mindful that both parents have a fundamental right to exercise the care, custody, and control of their child, just as both parents have a fundamental right to exercise their respective religious beliefs. These rights must be protected, of course, but must be considered in light of the district court's overriding concern—that is, the best interests of the child.